UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PETER DESILVA,<br>7428 Bluffs Lane, Apt. B3<br>Annapolis, MD  21403,<br><br>ROSE RUMBER<br>2126 Minnesota Avenue, S.E.<br>Washington, D.C.  20020,<br><br>JOSEPH RUMBER<br>2126 Minnesota Avenue, S.E.<br>Washington, D.C.  20020,<br><br>MARION FLETCHER<br>3232 Pope Street, S.E.<br>Washington, D.C.  20020,<br><br>      Plaintiffs,<br><br>   v.<br><br>SHAUN DONOVAN, in his official<br>capacity as Secretary,<br>U.S. Department of Housing<br>and Urban Development,<br>451 7th Street, S.W.<br>Washington, D.C.  20410,<br><br>U.S. DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT,<br>451 7th Street, S.W.<br>Washington, D.C.  20410,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Nature of Action**

1.     This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§
551 *et seq.*, the Community Development Block Grant ("CDBG") program, 42 U.S.C. §§ 5301 *et
seq.*, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42

U.S.C. §§ 4601 *et seq.* ("URA"), and related regulations, for declaratory, injunctive and other appropriate relief against defendants Shaun Donovan, Secretary, U.S. Department of Housing and Urban Development ("HUD"), and HUD.  Plaintiffs request that this court review the actions of defendants concerning the Skyland Shopping Center project in southeast Washington, D.C.

## Jurisdiction and Venue

2.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 2201 (declaratory relief), and § 2202 (injunctive and further relief), and under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706.  Defendants have acted or failed to act in an official capacity under legal authority within the meaning of 5 U.S.C. § 702.

3.       Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## Introduction

4.       The District of Columbia has been planning for a mixed-use development at the Skyland Shopping Center in Southeast Washington, D.C.  The District has acquired the property at Skyland by purchase and eminent domain.

5.       Plaintiff Peter DeSilva owned the property located at 2648 Naylor Road, S.E., Washington, D.C.  20020.  This property is located in the Skyland Shopping Center.  HUD CDBG funds were used to acquire this property by eminent domain from Mr. DeSilva.

6.       Plaintiffs Rose and Joseph Rumber owned Skyland Liquors, located at 2648 Naylor Road, S.E., and were the tenants for the property owned by Peter DeSilva.  The Rumbers paid rent to Mr. DeSilva for use of the property and building at 2648 Naylor Road, S.E.

7.       Plaintiff Marion Fletcher was a tenant who owned Fletcher's Beauty Salon, located at 2832 Alabama Avenue, S.E., in the Skyland Shopping Center.  She had been associated with the business for thirty-three years and worked her way up from hair operator to

manager to shop owner in eighteen years.  The salon included several chairs used by other hair operators.  Fletcher's Beauty Salon is no longer in business.

8.     The Community Development Block Grant ("CDBG") program, established by Title I of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq*., is the federal government's principal economic development program.

9.     The District of Columbia and the National Capital Revitalization Corporation have used CDBG funds, including program income, for the Skyland project.  Upon information and belief, the District apparently has used $38 million or more of CDBG funds for the Skyland project.  The exact amount is not known to plaintiffs.  The District is now planning to transfer 18.5419 acres of the Skyland property to the developer, Gary Rappaport, at a purchase price of $700,000.  It has been announced that a Wal-Mart will be the anchor tenant of the Skyland project.

## Parties

10.     Plaintiff Peter DeSilva owned the property located at 2648 Naylor Road, S.E., Washington, D.C.  20020.  This property is located in the Skyland Shopping Center.  HUD CDBG funds were used to acquire this property by eminent domain.

11.     Plaintiffs Rose and Joseph Rumber owned Skyland Liquors, located at 2648 Naylor Road, S.E., and were the tenants for the property owned by Peter DeSilva.

12.     Plaintiff Marion Fletcher was a tenant who owned Fletcher's Beauty Salon, located at 2832 Alabama Avenue, S.E., in the Skyland Shopping Center.  She had been associated with the business for thirty-three years and worked her way up from hair operator to manager to shop owner in eighteen years.

13.     Defendant Shaun Donovan is Secretary of the U.S. Department of Housing and

Urban Development ("HUD").  He is sued in his official capacity.

14.      Defendant HUD is a Department of the Executive Branch of the United States

Government.

### Factual Background

### Skyland Project

15.      The Skyland project was described in an overview, dated February 27, 2004, for a

Section 108 Loan Guarantee application to HUD.  The project was described as follows:

> The Skyland redevelopment will be a 240,000 square foot high-quality retail
> center in the Hillcrest Neighborhood of Southeast Washington.  Skyland will
> be co-anchored by a discount department store like a Target and a supermarket.
> The National Capital Revitalization Corporation (NCRC) will assemble the
> Skyland parcels, conduct initial site preparations, and relocate current tenants.
> NCRC will carry out these tasks according to a Memorandum of Understanding
> between the District and NCRC.  After the site is prepared, NCRC will sell the
> site to the private sector development team.

District of Columbia Skyland Overview of Section 108 Loan Guarantee Application, February

27, 2004 (available at http://newsroom.dc.gov/file.aspx/release/9025/project_summary2.pdf).

16.      According to an article in The Washington Post, dated September 15, 2005, HUD

had advised the District that it could not use federal funds for the Skyland project.  The article

described the project as an upscale shopping center east of the Anacostia River.  Sanctions had

been levied against the city eight years earlier for repeatedly mismanaging federal development

grants.  The District's deputy mayor for planning and economic development said the city had

negotiated extensively with HUD in the past few years to have the sanctions lifted and agreed to

repay $6.8 million in disallowed debts.  *See* Debbi Wilgoren, *Federal Funding for Mall in SE*

*Falters*,    The    Washington    Post,    September    15,    2005    (available    at

http://www.washingtonpost.com/wp-

dyn/content/article/2005/09/14/AR2005091402481_pf.html).

17.     An article in the Washington Business Journal explained that HUD had permitted the National Capital Revitalization Corporation ("NCRC") to use $28 million in federal funds to purchase the properties at Skyland Shopping Center.  HUD had previously told NCRC it could not use the federal funds, which were proceeds from the sale of the Government Printing Office building near Union Station, because HUD had imposed sanctions on D.C.'s use of CDBG funds during the late 1990's as a result of the city's failure to keep track of millions in grant funds.  A HUD spokesman said, "We've opened the door a crack."  HUD gave NCRC "provisional approval to succeed," provided NCRC sought permanent approval through a formal application. NCRC planned to use the $28 million to pay for site control and would figure out how to handle the other costs later.  NCRC had originally intended to spend as much as $47 million on demolition, site preparation and tenant relocation, in addition to land acquisition.  *See* Sean Madigan, *Feds push Skyland deal within D.C. agency's reach*, Washington Business Journal, December 5, 2005

(available at http://www.bizjournals.com/washington/stories/2005/12/05/story1.html?page=all).

18.     By letter dated July 15, 2004, the District of Columbia submitted an application to the U.S. Department of Housing and Urban Development for Section 108 Loan Guarantee funding assistance for the Skyland project.  The application stated at page 9 that "The Rappaport Companies will be assisted by Harrison Malone Development, LLC, Marshall Heights Community Development Organization, Inc., and the Washington East Foundation.  Roles and equity stakes among the proposed development partners are under negotiation."

19.     On July 8, 2005, NCRC filed six condemnation complaints in the District of Columbia Superior Court against property owners at Skyland.  The complaints did not include a Declaration of Taking, which is required by the quick take method of condemnation set out in

D.C. Official Code § 16-1314.  The complaints were filed in spite of the statement of then-President Carter of NCRC in a letter dated May 3, 2004, that NCRC would not exercise eminent domain until there had been a commitment from an anchor tenant.

20.      The request by NCRC for Section 108 loan guarantee funds from HUD for the Skyland project was abandoned.  Instead of using Section 108 funds, NCRC used about $28 million in program income from CDBG funds.  In applying for those funds, NCRC indicated that the project was not for economic development, but was to benefit low- and moderate-income persons.

**Community Development Block Grant program**

21.      The Community Development Block Grant program was established by Title I of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.* (Public Law 93-383).  The program provides grants to state and local governments to further goals, including to provide decent housing and expand economic opportunities, principally for persons of low- and moderate-income.

22.      There are numerous regulations concerning the CDBG program.   One requirement is that the CDBG activity comply with a national objective.  One national objective is benefiting low- and moderate-income persons, which is described at 24 C.F.R. § 570.208.  One category of benefiting low- and moderate-income persons is "Area benefit activities," which is "an activity, the benefits of which are available to all the residents in a particular area, where at least 51 percent of the residents are low and moderate income persons."  *See* 24 C.F.R. § 570.208(a)(1)(i).

23.      Kenneth M. Donohue, HUD Inspector General, discussed weaknesses of the CDBG program in a statement to a subcommittee of the Senate Committee on Homeland

Security and Governmental Affairs on June 29, 2006.  Mr. Donohue stated that the repeated problems included: 1) the improper use of funds; 2) a lack of capacity (internal controls, accounting systems, processing deficiencies, etc.); 3) the requirements are not followed; 4) a lack of policy direction or adequate management; 5) goals or national objectives not met; and 6) a lack of monitoring reviews.  He explained that, over the last 2½ years, the HUD Inspector General had issued over 35 audit reports related to CDBG.  Those reports identified over $100 million in questioned costs and funds that could be put to better use.

24.     Concerns about the CDBG program were described in a New York Times article. It explained that the flexibility for mayors in spending decisions has led in some cases to misuses of money and fraud.  Also, the complicated formulas used to divide the money among local governments, which are based on population, poverty, the age of housing stock and overcrowding, have been criticized as not sending the money to the neediest communities.  *See* Michael Cooper, *Cities Face Tough Choices as U.S. Slashes Block Grants Program*, The New York Times, December 21, 2011 (available at http://www.nytimes.com/2011/12/22/us/cities-struggle-as-us-slashes-block-grants-program.html).

25.     Upon information and belief, HUD has failed to establish and carry out proper and effective procedures to monitor spending of grantees.  The monitoring appears to consist of after-the-fact audits of some programs, with the remedy consisting of requests to the grantee to establish better guidelines in the future and perhaps a return of some funds.  Upon information and belief, the procedures used by HUD include retroactive monitoring.  HUD fails to conduct oversight, review or make findings at the time that funds are spent.  The retroactive monitoring is ineffective and fails to prevent improper and unauthorized funding of projects.

26.     Upon information and belief, a substantial portion of the monitoring conducted by

HUD of CDBG and other projects is performed by the HUD Office of Inspector General ("OIG"). The HUD OIG selects audit subjects through processes, including risk-assessment and hotline inquiries. Upon information and belief, this audit process does not include all CDBG projects, but only those selected to be audited. It is not clear the extent to which HUD conducts monitoring or oversight of CDBG and other projects in addition to or outside the scope of the efforts of the HUD OIG.

27.     Upon information and belief, the audit process and corrective actions may take a number of years to accomplish. As a result, the remedies and corrections are implemented years after the problems and violations of regulations had occurred.

28.     Some well-off communities sell their grants rather than use them for eligible projects that benefit low- and moderate-income persons. A spokesman for HUD said that "while not expressly prohibited by law or regulation," the department strongly discourages such sales. *See* Alison Leigh Cowan, *Development Grant Sales are Brisk in Los Angeles*, The New York Times, February 16, 2013 (available at http://www.nytimes.com/2013/02/17/us/politics/los-angeles-county-trades-on-its-federal-grants.html?pagewanted=all&_r=0).

**HUD monitoring reports on CDBG programs**

29.     There are numerous HUD monitoring reports on CDBG programs. Several examples illustrate the concerns and shortcomings of HUD programs, including the CDBG program.

30.     The Office of Inspector General of HUD conducted a review of the administration by the District of Columbia (grantee) of the HOME program funds that it provided to a limited partnership managed by developer H.R. Crawford for rehabilitation/construction of Parkside Terrace. The memorandum about this review was sent to Frances Bush, Director, Office of

Community Planning and Development, HUD Washington, D.C. Field Office, on February 25, 2010.  The Report stated that the grantee had repaid approximately $1 million in ineligible HOME funds it provided for Parkside Terrace.  In a monitoring report to the grantee, dated December 19, 2006, HUD asked the grantee to develop written procedures to maintain records and manage and track the progress of projects.  In the next monitoring review, conducted during the weeks of July 29 and August 4, 2008, HUD found that the grantee's monitoring procedures had been neither dated nor approved by management.  The February 25, 2010, memorandum recommended that the District implement adequate procedures to ensure that its HOME funds were used in accordance with program requirements.  *See* HUD Memorandum No. 2010-PH-1802, Subject: District of Columbia – HOME funds provided to developer H.R. Crawford, February 25, 2010 (available at http://www.hud.gov/offices/oig/reports/files/ig1031802.pdf).

31.    In another audit report, the OIG found that the District (grantee) did not administer its HOME program in accordance with federal requirements.  The grantee charged more than $1.6 million in ineligible costs to its HOME program and could not support approximately $6.5 million in costs charged to the program.  The OIG recommended that the Director of HUD's Washington, D.C., Office of Community Planning and Development require the grantee to recover more than $1.6 million spent on ineligible expenses. An additional recommendation was that the grantee create and implement procedures to ensure that HOME funds are disbursed and used in compliance with applicable requirements.  The grantee generally concurred with the findings and stated that improvements would be implemented to address the management challenges noted in the report.  *See* HUD Audit Report No. 2011-PH-1005, Subject: District of Columbia did not administer its HOME Program in accordance with federal requirements, December 23, 2010 ( http://www.hud.gov/offices/oig/reports/files/ig1131005.pdf),

at p. 2.

32.     HUD programs in Prince George's County, Maryland, have involved failure to spend funds within the deadline. HUD officials said they would reclaim more than $2 million in HOME Program funds to Prince George's County for affordable housing projects, because the county failed to spend the funds within the five-year deadline.   A HUD official, Frances W. Bush, Director of Community Planning and Development in HUD's Washington field office, had initially recommended granting the county a deadline exception.   However, Mercedes Marquez, HUD's Assistant Secretary for Community Planning and Development, denied the exception, explaining that, "Lack of proper program management does not constitute good cause for a waiver."   Marquez noted that the county had an unspent HOME fund balance of more than $17 million, nearly 36% of the HOME funds it has received since 1992. *See* Jonathan Mummolo, *HUD wants $2 million back from Pr. George's*, The Washington Post, January 17, 2010 (http://www.washingtonpost.com/wp-dyn/content/article/2010/01/16/AR2010011602833.html).

33.     HUD gave Prince George's County a deadline to devise a plan to return at least $1 million that was mismanaged in the federal HOME affordable housing program. *See* Miranda S. Spivack, *Fallout from Johnson years still costing Prince George's time and money*, The Washington Post, February 17, 2013 (available at http://articles.washingtonpost.com/2013-02-17/local/37149796_1_hud-officials-home-funds-urban-development).

34.     Concerns about public housing in Baltimore involved the proper use of CDBG funds.   In a lengthy opinion, a district judge in Maryland stated that the federal defendants, at best, abused their discretion and failed to meet their obligations under the Fair Housing Act to promote fair housing affirmatively. *See Thompson v. U.S. Dept. of Housing and Urban Dev.*, 348 F.Supp.2d 398, 409 (D.Md. 2005).   HUD conducted monitoring reviews of Baltimore

CDBG activities through the 1980's and found several violations. There were numerous subsequent reviews. For example, in 1990, HUD issued CDBG monitoring findings that Baltimore City's CDBG program was in substantial noncompliance with applicable laws and regulations. In the monitoring reviews, HUD repeatedly found that the Housing Authority of Baltimore City violated Fair Housing requirements. *Thompson*, 348 F.Supp.2d at 507-510. The court held that the federal defendants violated the Fair Housing Act by failing adequately to consider regional approaches to ameliorate racial segregation in public housing in the Baltimore Region. *Id*. at 524.

35.     A HUD report dated December 17, 2013, discussed the results of the review of the CDBG program in the city of Norfolk, Virginia. The HUD OIG found that the city could not provide adequate documentation to justify nearly $2.5 million of about $4 million it spent on 12 of 16 sample activities reviewed. In addition, 14 of the 16 activities were required to meet a national program objective. The city could not demonstrate that the activities met or would meet their designated objectives. The city demonstrated poor record keeping and inadequate planning related to its program activities. As a result, many activities reviewed were extensively delayed. *See* HUD OIG Audit Report Number 2014-PH-1001, December 17, 2013 (available at http://www.hudoig.gov/sites/default/files/documents/2014-PH-1001.pdf).

36.     A HUD OIG Memorandum concerning the village of Spring Valley, NY, addressed an allegation that the village had used eminent domain and federal funds to seize property. The Memorandum explained that the acquisition of property is an allowable CDBG activity if funding was used before fiscal year 2006, citing HUD Docket No. FR-5077-N-01, July 17, 2006. The village had used funds from program years 2003 through 2005 funding to acquire five properties for use in its urban renewal project. In addition, the village used $102,438 in

CDBG funds to acquire a property, which was subsequently transferred to a developer.  There was no documentation to support the requirement that the $102,438 in CDBG funds met one of the CDBG national objectives.  Any expenditures that are ineligible should be reimbursed from non-Federal funds. *See* HUD OIG, Memorandum No. 2012-NY-1802, September 28, 2012 (available at http://www.hudoig.gov/sites/default/files/documents/audit-reports/2012-ny-1802.pdf), at pp. 4-6.

37.     A HUD OIG Memorandum concerning the city of Tulsa, Oklahoma, addressed a review of verification of action taken on recommendations in audit report 2008-FW-1012, titled, "The City of Tulsa, OK, Allowed Its Largest Subrecipient To Expend $1.5 Million in Unsupported CDBG Funding," issued August 4, 2008.   The recommendations in this Memorandum included that the city should repay HUD the higher of the cost or market value of the properties purchased with CDBG funds that the Tulsa Development Authority still owned. The book value of the properties was $3,122,900.   The Memorandum explained that the Authority's land held for resale included properties purchased from 1975 to 2005.  Since the Authority had held the properties from 6 to 36 years, it appeared that the Authority engaged in land banking, which is an activity that is not permitted under CDBG.   *See* HUD OIG, Memorandum No. 2012-FW-1803, April 10, 2012 (available at http://www.hudoig.gov/sites/default/files/documents/audit-reports//2012-fw-1803.pdf).

38.     A HUD OIG Memorandum concerning the city of San Diego, California, addressed whether San Diego administered its CDBG program in accordance with HUD requirements when funding redevelopment agency projects.  The Audit Report stated that the city failed to properly administer its CDBG funds.  For the 35 redevelopment projects sampled in the review, almost $13 million in CDBG costs were questionable, including more than $1.8

million in ineligible and $11 million in unsupported costs.  Also, the city failed to execute loan agreements and repayment schedules for the CDBG loans issued to the agency with an overall principal balance of more than $63 million.  The agency did not make consistent good faith efforts to repay the CDBG loans to the city and primarily used the debt to leverage or obtain state tax increments.  *See* HUD OIG Audit Report No. 2009-LA-1005, December 30, 2008 (available at http://www.hud.gov/offices/oig/reports/files/ig0991005.pdf).

39.    A June 3, 2013, letter from HUD's Honolulu field office demanded that $8 million in CDBG funds be returned to HUD.  The city had given a non-profit a $7.9 grant in 2003 to develop a wellness center and camp.  A HUD official said that the wellness center and camp had been used improperly and failed to comply with eligibility requirements for the grant. The official also was highly critical of the city's failure to correct the improprieties despite HUD warnings.  The city instead asked HUD to accept $1.88 million as a reimbursement for the land the city intended to take over.  *See* Gordon Y.K. Pang, *City offers HUD $1.88 million to settle ORI controversy*, Star Advertiser, July 19, 2013 (available at http://www.staradvertiser.com/news/breaking/20130719_City_offers_to_pay_HUD_188_million _to_settle_ORI_controversy.html?id=216206431).

40.    The city of St. Louis, Missouri, is being required by HUD to spend its CDBG funds in a more transparent manner.  The head of HUD's St. Louis field office said that any block grant money spent in ways that do not conform with the new regulations would be subject to recapture, which means the city would have to pay the money back out of its general budget. *See* Tim Logan, *Feds forcing St. Louis to rework community development grants*, St. Louis Post-Dispatch, October 25, 2013 (available at http://www.stltoday.com/business/local/feds-forcing-st-louis-to-rework-community-development-grants/article_c87b4e3c-64c9-5582-a218-

78ee1775be01.html).

41.     Essex County, New Jersey, was notified by HUD that it had to reimburse its line of credit, pursuant to 24 C.F.R. 570.910(b)(5), for improperly expended CDBG funds.   On December 9, 2009, the County entered into a repayment agreement with HUD for $1,446,332. *See* Public Notice, Essex County Division of Housing and Community Development (available at http://www.essex-countynj.org/AmendmentRepayment2011.pdf).

42.     The municipality of Mayaguez, Puerto Rico, participated in the CDBG program. On July 1, 1997, the HUD OIG issued an audit report about the Mayaguez CDBG program.   On July 9, 2004, a HUD official wrote the Mayor of Mayaguez and required payment of $3,972,069, based on findings of the HUD audit.   A repayment agreement allowed Mayaguez to resolve the audit findings by developing other projects paid for with local municipal funds that met CDBG criteria, rather than repaying HUD directly with municipal funds.   By the time HUD closed its audit in November 2009, Mayaguez had expended roughly $4,000,000 on municipal projects as repayment to HUD.   *Mun. of Mayaguez v. Corporacion Para el Desarrollo del Oeste*, 824 F.Supp.2d 289, 293-94 (D.P.R. 2011).

43.     There has been a long-standing concern that CDBG funds are not being used properly to benefit low- and moderate-income families.   Rep. Henry B. Gonzalez stated in a letter to The New York Times his concern that proposed regulations would weaken the primary objective of the CDBG program, "which requires those funds to be used to benefit principally the low- and moderate-income residents of our urban communities.   *See* Rep. Henry B. Gonzalez, Chairman, House Subcommittee on Housing and Community Development, *A Watering Down of Community Development*, Letter to the Editor, The New York Times, October 14, 1982 (available   at   http://www.nytimes.com/1982/10/22/opinion/l-a-watering-down-of-community-

development-237308.html).

**Prohibition on use of HUD FY 2006 funds for eminent domain-related activities**

44.     There is a prohibition on the use of HUD Fiscal Year 2006 funds for eminent-domain related activities. *See* HUD Docket No. FR-5077-N-01, "Statutory Prohibition on Use of HUD Fiscal Year 2006 Funds for Eminent Domain-Related Activities," 71 FR 40634, July 17, 2006. The discussion of this prohibition states that CDBG grantees should carefully evaluate the facts of any project proposed to receive FY 2006 CDBG funds involving the exercise of eminent domain. Grantees are encouraged to consult with HUD field staff. Further, it is critical that HUD and its grantees have a strong dialogue and use common sense solutions where CDBG funding and the exercise of eminent domain and economic development intersect. 71 FR 40635.

45.     Upon information and belief, this prohibition on the use of HUD funds for eminent domain-related activities has continued for fiscal years following 2006.

**Corrective and remedial actions**

46.     The provisions concerning corrective and remedial actions for CDBG activities are at 24 C.F.R. § 570.910. The Secretary may take actions as provided in this regulation. The actions shall be designed to prevent a continuation of the performance deficiency; to mitigate, to the extent possible, the adverse effects or consequences of the deficiency; and to prevent a recurrence of the deficiency. 24 C.F.R. § 570.910(a).

47.     The actions that HUD may take in response to a deficiency are listed in 24 C.F.R. § 570.910(b). The actions HUD may take include:

§ 570.910(b)(2)(iv)  Other actions which will serve to prevent a continuation of the deficiency, mitigate (to the extent possible) the adverse effects or consequences of the deficiency, and prevent a recurrence of the deficiency;

§ 570.910(b)(4)  Advise the recipient to suspend disbursement of funds for the deficient activity;

§ 570.910(b)(5)  Advise the recipient to reimburse its program account or letter of credit in any amounts improperly expended and reprogram the use of the funds in accordance with applicable requirements.

**CDBG expenditures on Skyland Shopping Center project**

48.     The Skyland project was described in an overview, dated February 27, 2004, for a

Section 108 Loan Guarantee application.  The financing for the project was described as follows:

The District of Columbia proposes to borrow up to $27.97 million to invest in Skyland.  The District will loan NCRC $24.9 million of available Section 108 proceeds to prepare the site.  The District will repay the Section 108 borrowing with the proceeds from the disposition of the Government Printing Office (GPO) parcel under contract to sell for $28.7 million by 9/15/2004.

District of Columbia Skyland Overview of Section 108 Loan Guarantee Application, February

27, 2004 (available at http://newsroom.dc.gov/file.aspx/release/9025/project_summary2.pdf).

49.     A HUD official discussed the use of Section 108 funds for Skyland.  In a letter

[apparently dated November 30, 2006] from Anna Maria Farias, Deputy Assistant Secretary for

Grant Programs, HUD, Ms. Farias stated that HUD had been informally advised by the District

of Columbia that it was no longer seeking to use HUD Section 108 guaranteed loan funds for the

Skyland project.

50.     The letter also explained the relationship between HUD, the District of Columbia

and NCRC, as follows:

HUD does not have a direct grantee relationship with NCRC for purposes of the Community Development Block Grant (CDBG) program.  For the District of Columbia, the Department of Housing and Community Development (DHCD) is the agency responsible for the CDBG program.  NCRC's subsidiary, the Redevelopment Land Agency Revitalization Corporation (RLARC), does have an indirect source of CDBG funding derived from a portfolio of real property acquired in the 1950's, 1960's and 1970's through the long defunct Urban Renewal program.  Further, RLARC is a subrecipient of DHCD for purposes of the CDBG program.  RLARC receives lease income, sales disposition proceeds and other revenue generated by this portfolio and, for purposes of the CDBG program, this revenue stream is known as program income.  RLARC

splits this revenue stream with the District on a percentage basis and, over the past several years, the District has realized more than $40 million in program income from the disposition and lease of urban renewal property. The use of this program income is subject to all CDBG program requirements pursuant to 24 CFR 570.800, as such regulations were in force in 1996.

51.     The letter discussed the land acquisition of properties at Skyland by the

Redevelopment Land Agency Revitalization Corporation ("RLARC"), as follows:

> It is the Department's understanding that RLARC recently used more than $22.6 million of CDBG program income to finance real property acquisition at the Skyland site.  Real property acquisition is an eligible activity under the CDBG program as defined at 24 CFR 570.201(a).  The Skyland project has been identified in the District's CDBG-related planning documents for the past several years, which is prerequisite for using CDBG funds for the project.  To date, HUD has no indication that DHCD or RLARC has failed to comply with CDBG requirements as they may be applicable to the acquisition of real property for the Skyland project.  While HUD did approve RLARC's environmental request for release of funds (RROF) for the use of CDBG program income for this purpose, HUD has not monitored or otherwise reviewed the actions of DHCD or RLARC with respect to this project.  The timing of future HUD monitoring of DHCD will be based upon the outcome of HUD's annual risk assessment process that establishes monitoring priorities.

52.     The letter further discussed whether the District was permitted to use CDBG

funds for economic development activities.  The letter stated:

> In 1997, HUD advised DHCD to suspend disbursements of CDBG funds for economic development activities based on the results of monitoring carried out at that time.  HUD's primary concern related to misclassification of economic development activities and inadequate documentation with regard to CDBG national objectives, public benefit and financial justification for assistance.  Basic acquisition activities carried out by DHCD or its subrecipients pursuant to 24 CFR 570.201(a) were never subject to this corrective action.

53.     Upon information and belief, the properties at Skyland would not have been

acquired or taken by eminent domain if HUD funding were not available.

54.     Upon information and belief, NCRC did not have had funds (other than HUD

CDBG funds) to permit it to acquire or take by eminent domain the Skyland properties and to

relocate the businesses.

55.     Upon information and belief, the use of HUD CDBG funds was necessary for NCRC to acquire or take by eminent domain the Skyland properties.

### Amount of expenditures on Skyland

56.     The District of Columbia (including NCRC) has spent millions of dollars on the Skyland project.  Upon information and belief, the District has spent more than $38 million on Skyland.  As of July 2013, the spending on Skyland using CDBG funds had been $37,284,000, according to Action Plans.  In addition, District employees have worked an enormous number of hours on Skyland matters.

57.     Upon information and belief, no cost/benefit analysis has been performed on the Skyland project and no budget total has been approved.

58.     Upon information and belief, the timetable for the Skyland project has been reset numerous times.

59.     An article in The Washington Post reported that the District has spent $28 million in payments to the original businesses at Skyland to leave.  The article explained that the District spent more than $1 million on outside legal expenses and the District's own attorneys have devoted more than 10,000 hours to Skyland matters.  In addition, the article stated that Skyland's developers have spent $3 million of their own money.  *See* Jonathan O'Connell, *Skyland Shopping Center re-development will come at a price*, The Washington Post, January 27, 2013 (available at http://www.washingtonpost.com/business/capitalbusiness/2013/01/25/5734a7c6-665c-11e2-85f5-a8a9228e55e7_story.html).

60.     According to a Washington Business Journal article, the District has spent about $200,000 per Skyland tenant on relocation expenses.  In addition, RCN Telecom Services may

have received as much as $4.25 million.  *See* Michael Neibauer, *Murry's market to relocate from Skyland Shopping Center*, Washington Business Journal, Nov. 28, 2012 (available at http://www.bizjournals.com/washington/breaking_ground/2012/11/murrys-market-to-relocate-from.html).

**Appraisals of the Skyland properties**

61.    The acquisition process includes requirements and regulations concerning appraisals and appraisal reviews. The Uniform Appraisal Standards for Federal Land Acquisitions were prepared for use by appraisers to promote uniformity in the appraisal of real property among the various agencies acquiring property on behalf of the United States.  The Standards presume full compliance with the pertinent provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, et seq. ("URA").

62.    HUD Handbook 1378 is titled, "Tenant Assistance Relocation and Real Property Acquisition Handbook."  The purpose of the Handbook is to consolidate basic statutory and regulatory requirements and HUD policy guidance on acquisition and relocation under the URA. The requirements and policies are to be followed when acquiring real property or displacing persons for a project or program with HUD financial assistance. *See* Chapter 1, page 1 (http://www.hud.gov/offices/adm/hudclips/handbooks/cpdh/1378.0/1378c1CPDH.pdf).

63.    By letter dated February 22, 2005, NCRC sent an offer to Peter DeSilva to purchase his property at a price equal to the appraised value of $600,000.  That offer was based on an appraisal by Millennium Advisors.  The District subsequently abandoned that appraisal and engaged David Lennhoff and PGH Consulting LLC to prepare a new appraisal.  The PGH appraisal, dated February 25, 2008, estimated that the fair market value of the property as of

November 18, 2005, was $285,000.  The District has claimed that title to the DeSilva property transferred on November 18, 2005.

64.     Upon information and belief, HUD failed to monitor these appraisals for the DeSilva property. HUD's failure to monitor permitted the District to abandon the appraisal that was the basis for the $600,000 and to procure a new appraisal at a much lower fair market value after the condemnation litigation had begun.

65.     Upon information and belief, the substitution of a new appraisal with a much lower valuation in the course of litigation is in violation of HUD regulations and requirements concerning appraisals, appraisal reviews, offers to purchase and fairness to the property owner.

66.     The assessed value of Mr. DeSilva's property for Fiscal Year 2007 was $627,260. The PGH appraisal estimate of $285,000 as of November 15, 2005, was $342,260 below that assessed value.

67.     The assessed value of Mr. DeSilva's property for Fiscal Year 2008 was $777,460. The PGH appraisal estimate of $285,000 was $492,460 below that assessed value.

68.     In the District of Columbia, the assessed value of real property is the "estimated market value" of the property on January 1st of the year preceding the tax year.  *Wolf v. District of Columbia*, 611 A.2d 44, 47 (D.C. 1992) (citing D.C. Code § 47-820(a)(1981).  For example, the assessment for fiscal year 2007 is the market value as of January 1, 2006.

69.     Upon information and belief, there were no appraisal reviews prepared, in violation of HUD regulations and appraisal guidelines.  The procedure for land acquisition using HUD funds is required to include appraisal reviews.

70.     The importance of appraisal reviews is explained on the Federal Highway Administration website.  The federal regulation, 49 C.F.R. § 24.104, is discussed.  The website

states that:

> The purpose is to ensure that a qualified review appraiser determines the estimate of fair market value (FMV) is reasonably supported by an acceptable appraisal.  …  The review appraiser plays an important role in the acquisition process and is charged with a great deal of valuation and administrative responsibility.  …

> An appraisal review is a technical review of an appraisal by an experienced, competent, qualified review appraiser.  Appraisal review is a critical quality control element in the valuation/acquisition process.

*See* Project Development Guide, Appraisal Review (available at http://www.fhwa.dot.gov/real_estate/practitioners/right-of-way/corridor_management/pdg/pdg08.cfm).

### HUD policy about monitoring CDBG projects

71.     The U.S. Government Accountability Office ("GAO") prepared a report about Community Development Block Grants.  It is titled, "Community Development Block Grants: Program Offers Recipients Flexibility but Oversight Can Be Improved," GAO 06-732, July 2006 (available at http://www.gao.gov/new.items/d06732.pdf).  According to the report, the findings of the GAO included the following discussion:

> HUD uses a risk-based approach to monitor CDBG recipients; however, it has not developed a plan to replace monitoring staff or fully involved its field staff in plans to redesign an information system they use to monitor recipients. HUD's monitoring strategy calls for its field offices to consider various risk factors when determining which recipients to review because it has limited monitoring resources, and its workload has increased as its staffing levels have decreased.  …

> Although it has issued a clear policy stating what actions it will take when entitlement communities fail to meet the statutory requirements that funds be spent in a timely manner, HUD has not developed similar guidance establishing a consistent framework for holding CDBG recipients accountable for deficiencies identified during monitoring.

72.     The report included a letter to chairmen of pertinent Congressional committees. The letter discussed at page 4 the sanctions HUD may assess, as follows:

For deficiencies other than being slow to expend funds (such as funding an ineligible activity or failing to document that an activity meets one of the program's national objectives), HUD has the flexibility to assess sanctions ranging from issuing a warning letter to advising the recipient to return CDBG funds. Although its field offices have great flexibility when making sanctions, HUD has not issued guidance establishing a consistent framework to ensure that these offices are treating recipients that commit similar infractions equitably. In conducting our work, we found instances in fiscal year 2005 where findings that appeared to be similar were associated with different enforcement actions.

73.     The letter discussed at page 10 HUD's field offices and information systems, as follows:

HUD's Office of Community Planning and Development (CPD) administers the CDBG program through program offices at HUD headquarters and 42 field offices located throughout the United States. The headquarters offices set program policy, while staff in the 42 field offices monitor recipients. …

In September 2005, CPD issued a new monitoring handbook. The handbook states that monitoring is an integral management control technique and that the goal of monitoring is to determine compliance, prevent/identify deficiencies, and design corrective actions to improve or reinforce program participant performance. It contains two chapters on monitoring the CDBG program, and these chapters include 29 exhibits for field office staff to use when monitoring CDBG recipients.

HUD staff use two major information systems to monitor the use of CDBG funds –IDIS and GMP. Developed in fiscal year 1996, IDIS is a management information system that consolidates planning and reporting processes across HUD's four formula grant programs. The recipients use this system to enter information on their plans, establish projects and activities to draw down funds, and report accomplishments.

74.     The letter discussed at page 11 a previous report, as follows:

In April 1999, we issued a report on HUD's oversight of CDBG and CPD's three other formula grant programs. [GAO, *Community Development: Weak Management Controls Compromise Integrity of Four HUD Grant Programs*, GAO/RCED-99-98 (Washington, D.C.: Apr. 27, 1999)] At that time, we found that HUD's monitoring did not ensure that the programs' objectives were being met or that recipients were managing their funds appropriately. We also noted that IDIS did not provide the information necessary to accurately assess recipients' performance and thus did not compensate for HUD's breakdowns in monitoring. … Because of the actions HUD took in response to our recommendations

in this report, we removed CPD's programs from our high-risk list in 2001.

75.    The letter discussed at page 23 HUD's monitoring strategy, as follows:

HUD's monitoring of the CDBG program focuses on high-risk recipients.
Each year, CPD sets a formal monitoring goal.  Its goal in fiscal year 2005
was for CPD as a whole and each of its field offices to monitor a minimum
of 20 percent of their formula and competitive recipients.  According to
the HUD official who set the goal, he set it at 20 percent based on the
need to balance government stewardship with available resources,
including staff and travel funds.  With a 20 percent goal, he noted that
it would be conceivable that every recipient would be monitored over a
period of 5 years.

76.    The letter discussed at page 27 the findings resulting from monitoring, as follows:

Fifty-seven percent of HUD's fiscal year 2005 reviews resulted in at least
one finding.  In total, HUD's fiscal year monitoring resulted in 581 findings
and 447 concerns.  [A finding is a deficiency in program performance based
on a statutory, regulatory, or program requirement for which sanctions or
other corrective actions are authorized.  A concern is a deficiency in
program performance not based on a statutory, regulatory, or other
program requirement.]  Examples of cited findings included not documenting
a national objective, funding an ineligible activity, poor recordkeeping,
and incomplete subrecipient requirements.

77.    The letter explained at page 27, n. 31 that:

A finding is a deficiency in program performance based on a statutory,
regulatory, or program requirement for which sanctions or other
corrective actions are authorized.  A concern is a deficiency in
program performance not based on a statutory, regulatory, or other
program requirement.

78.    The letter discussed at page 32 the failure of HUD to issue guidance on certain

enforcement actions, as follows:

Although HUD has issued a clear policy stating what actions it will take
when entitlement communities fail to meet the statutory requirements
that funds be spent in a timely manner, it has not developed similar
guidance establishing a consistent framework for holding CDBG recipients
accountable for deficiencies identified during monitoring.  … As it monitors
CDBG recipients, however, HUD has the flexibility to assess other sanctions
ranging from issuing a warning letter to advising the recipient to pay back
CDBG funds.  HUD headquarters has not issued guidance that describes

conditions under which each type of sanction should be taken, and we found instances in fiscal year 2005 where findings that appeared to be similar were associated with different enforcement actions.

79.     The letter discussed at pages 36-38 the conclusions.  The letter stated that:

Many communities use the CDBG funds to benefit their residents and increase the economic health of the community.  One of the cited strengths of the program is its flexibility, which allows communities to make decisions locally about the best use of the funds in their community.  Given the program's flexibility, it is critical that HUD ensure that recipients use funds in a manner that is consistent with the purposes of the program.
…
With program funding being cut as the number of grant recipients increases, it is essential for HUD to ensure that recipients use funds properly. Because it has limited monitoring resources, HUD has implemented a risk-based process to identify recipients for review.  However, HUD faces challenges as it carries out these responsibilities.

80.     The letter included Comments from HUD as Appendix IV.  One comment at page 63 stated that:

We do not agree that HUD should ensure the proper use of funds just because program funding is "being cut as the number of grant recipients increases." We monitor because that is our stewardship responsibility.

81.     The GAO Comments at page 64 to HUD's letter included the following:

The regulatory language in 24 C.F.R. 570.910(a) states that corrective actions should be designed to (1) prevent a continuation of the performance deficiency; (2) mitigate, to the extent possible, the adverse effects or consequences of the deficiency; and (3) prevent a recurrence of the deficiency.

**HUD Community Planning and Development Monitoring Handbook**

82.     HUD Handbook 6509.2, *Community Planning and Development Monitoring Handbook*, establishes standards and provides guidance for monitoring Community Planning and Development (CPD) programs.   The objectives, described at Chapter 1-1, are described as follows:

Monitoring is an integral management control technique and a Government

24

Accountability Office (GAO) standard.  It is an ongoing process that assesses the quality of a program participant's performance over a period of time. Monitoring provides information about program participants that is critical for making informed judgments about program effectiveness and management efficiency.  It also helps in identifying instances of fraud, waste and abuse.  It is the principal means by which the Department:

A.  ensures that programs and technical areas are carried out efficiently, effectively, and in compliance with applicable laws and regulations.

The approach to monitoring is described at Chapter 1-5, as follows:

As stated above, HUD staff should view monitoring, not as a once a year or periodic exercise, but as an ongoing process involving continuous communication and evaluation.  Such a process involves frequent telephone/email contacts, written communications, analysis of reports and audits, and periodic meetings.  It is the responsibility of HUD staff to keep fully informed concerning participant compliance with program requirements and the extent to which technical assistance is needed.

The overriding goal of monitoring is to determine compliance, prevent/identify deficiencies and design corrective actions to improve or reinforce program participant performance.  As part of this process, HUD staff should be alert for fraud, waste and mismanagement or situations with potential for such abuse.

83.     Chapter 2 of the Handbook discusses the management of monitoring activities.

The explanation of closing findings at Chapter 2-12 states:

General.  Follow-up by HUD reviewers serves two purposes:

1.  it provides an opportunity to evaluate the effectiveness  of our monitoring efforts in maintaining or improving participant performance; and

2.  it enables us to determine that required corrective actions are implemented.

GAO considers the monitoring process to be completed only after an identified deficiency has been corrected, the corrective action produces improvements and it is determined that management action is not needed (see GAO/AIMD-00-21.3.1, *Standards for Internal Control in the Federal Government*, "Monitoring").

84.     The section on Monitoring in GAO *Standards for Internal Control in the Federal Government* provides:

> Monitoring of internal control should include policies and procedures for ensuring that the findings of audits and other reviews are promptly resolved.  Managers are to (1) promptly evaluate findings from audits and other reviews, including those showing deficiencies and recommendations reported by auditors and others who evaluate agencies' operations, (2) determine proper actions in response to findings and recommendations from audits and reviews, and (3) complete, within established time frames, all actions that correct or otherwise resolve the matters brought to management's attention.  The resolution process begins when audit or other review results are reported to management, and is completed only after action has been taken that (1) corrects identified deficiencies, (2) produces improvements, or (3) demonstrates the findings and recommendations do not warrant management action.

### HUD monitoring of the Skyland project

85.     Upon information and belief, HUD has not conducted a timely and complete review of the Skyland project.

86.     Upon information and belief, HUD has not complied with HUD Handbook 6509.2, *Community Planning and Development Monitoring Handbook*, and GAO/AIMD-00-21.3.1,  *Standards for Internal Control in the Federal Government*, in monitoring the Skyland project.

87.     In a letter dated March 10, 2006, to undersigned counsel, Paul D. Webster, Director, Financial Management Division, Office of Assistant Secretary for Community Planning and Development, HUD, discussed the Section 108 application by the District of Columbia.  Mr. Webster explained that, "HUD is currently reviewing the District's Section 108 application for the Skyland project.  Please be assured that the application is being reviewed for compliance with all applicable program and legal requirements."

88.    The HUD letter dated November 30, 2006, from Deputy Assistant Secretary Farias explained that HUD approved the request of RLARC for release of funds, but HUD had not monitored or otherwise reviewed the actions of DHCD or RLARC with respect to the Skyland project.  The letter stated:

> While HUD did approve RLARC's environmental request for release of funds (RROF) for the use of CDBG program income for this purpose, HUD has not monitored or otherwise reviewed the actions of DHCD or RLARC with respect to this project.  The timing of future HUD monitoring of DHCD will be based upon the outcome of HUD's annual risk assessment process that establishes monitoring priorities.

89.    The Farias letter also explained HUD's policy concerning selection of projects to be monitored.  The letter stated:

> With regard to monitoring of DHCD performance, HUD carries out an annual risk analysis of its CPD grantees in order to determine priorities for on-site monitoring.  HUD's field staff monitoring of DHCD in May 2005 focused primarily on subrecipient management aspects of its CDBG program and was followed by monitoring of the District's Housing Opportunities for Persons with AIDS (HOPWA) program in 2006.  While RLARC was one of the subrecipients reviewed in the May 2005 monitoring, the Skyland project was not included in the review as it was not funded at that time.  HUD is currently engaged in carrying out the risk analysis process for FY 2007 and will establish monitoring priorities based on the analysis of the District's CDBG, HOME, HOPWA and Emergency Shelter Grants (ESG) programs.

90.    There are a number of emails between Frances W. Bush, Director, Community Planning and Development Division, HUD D.C. Office, and undersigned counsel.

91.    In an email dated December 4, 2006, to undersigned counsel, Ms. Bush wrote:

> In response to your inquiry concerning the CDBG national objective for the Skyland Project, the Department's November 30, 2006 letter correctly identifies the national objective as stated by the city in its Consolidated Annual Action Plan as benefit to low- and moderate-income persons.

92.    In an email dated December 6, 2006, to undersigned counsel, Ms. Bush wrote:

27

In response to your voice mail message concerning the city's Consolidated
Plan and justification to support the low- and moderate area national
objective determination, you may obtain a copy of the city's Consolidated
Plan directly from the city.  Regarding justification for the city's
national objective determination, grantees are required to maintain
project information such as documentation to support the national
objective determinations included in the Consolidated Plan in their
local files.  You may contact Mr. Victor Selman, Interim Director,
of the D.C. Department of Housing and Community Development
to obtain a copy of the city's Consolidated Plan and project information
that the city must maintain in its local files.

93.      In an email dated December 21, 2006, to undersigned counsel, Ms. Bush wrote:

I have email Mr. Selman with a request that he contact you regarding
your concerns.  As I indicated in a previous email, the city is required
to maintain documentation in its files to support national objective
determinations in the consolidated plan.  HUD does not require the
grantees to submit the supporting documentation with the ConPlan.

94.      In an email dated January 26, 2007, to Ms. Bush, undersigned counsel wrote:

I have reviewed the compliance checklist for the Skyland Shopping Center
project and have the following questions.

1.  The national objective criteria which was checked is area benefit
activity under the category – Benefits low-and-moderate-income
persons.

How is the determination made that Skyland is an area benefit activity?
How is the determination made that at least 51 percent of the residents
of the area are low and moderate income persons?  What "area" is being
considered for the area benefit activity?

What are the income levels that meet the requirement of low and moderate
income?

2.  Box 5.a.  Relocation has a check for "yes" under the question – is the
property vacant?  That is not correct because the property is not vacant.

Box 5.a. has a check for "no" under the question – are relocation
regulations applicable?  That answer also appears to be incorrect.
It is my understanding that the relocation regulations do apply.

Please review these or advise me which agency or person is responsible

for review of the determinations made under the checklist.

95.     In an email dated January 31, 2007, to undersigned counsel, Ms. Bush wrote:

Thank you for your most recent inquiry regarding the Skyland project.  As
I indicated in a previous email, request for information on the city's national
objective determination must be addressed directly to the city.  The
Department does not require that the city submit supporting documentation
to HUD regarding the national objective determination.  The city is
required to maintain supporting documentation in its files for review by
the Department during monitoring or other program management reviews.

96.     In an email dated August 16, 2008, to Paul Webster and Janice Olu of HUD,

undersigned counsel wrote:

I remain very concerned that no one at HUD is monitoring or reviewing
the Skyland project and the use of CDBG funds.  There are many issues
about the project.  I think that it is imperative that someone at HUD look
into the project.

Mr. Szupper also has nothing to do with reviewing appraisals.  I believe
he indicated that the HUD field office has an appraisal review conducted.

If that is true, I would like a copy of the appraisal review.  There are
serious problems with the appraisals conducted for the District concerning
the Skyland properties.  Once again, it appears that no one at HUD has
looked at the appraisals or determined whether they comply with appraisal
standards.  That was the motivation of my inquiry a week ago and, after
numerous phone calls and emails, I have found no one at HUD who is
monitoring the appraisals.

97.     In an email dated September 7, 2008, to Joan Morgan of HUD, undersigned

counsel wrote:

I am very concerned that the appraisal [for one of the properties] does
not comply with the standards required when HUD funds are used.

98.     In an email dated September 10, 2008, Ms. Morgan wrote:

Since this matter is in court, I suggest you contact the HUD litigation
attorney Kevin F. C. Carlin.

99.     In an email dated September 10, 2008, to Kevin Carlin of HUD, undersigned

counsel wrote:

> I represent several property owners and merchants at the Skyland Shopping
> Center in Southeast Washington, D.C.  The District of Columbia government
> is taking the property by eminent domain and using CDBG funds to
> purchase the property.
>
> There are many issues including the use of HUD funds (whether the benefit
> has been shown) and the compliance of the appraisals with proper
> appraisal standards.

100.    In an email dated September 11, 2008, Kevin F. C. Carlin, Associate Regional

Counsel for Litigation and Program Enforcement, Office of the Regional Counsel, Region III,

HUD, wrote to undersigned counsel:

> Give me a call.

101.    One issue discussed in the emails with Frances Bush is the Action Plan and the

use of HUD funds for Skyland.  Another issue concerns the appraisals for the Skyland properties.

In an email dated December 21, 2008, undersigned counsel wrote:

> The fact that Skyland is mentioned in the Action Plan does not mean
> that the D.C. government is following that plan for Skyland.
>
> Please let me know what your inquiry has found out about the plans
> for Skyland.  With the economy in the situation it is, I cannot imagine
> that the D.C. government will be able to put new retail in the Skyland
> location.
>
> It is very important that you look into this matter.  The businesses
> should not be shut down if there are no new businesses to go into
> the proposed shopping center.
>
> I expect a response.
>
> Also, I want you to look into the appraisals performed for the District.  It is my
> understanding that appraisal reviews are required.  It does not appear that
> an appraisal review has been conducted for the appraisals used by the
> District.  Who at HUD monitors the appraisals and the appraisal review
> process?
>
> The District is using HUD funds and HUD has a duty and obligation

to monitor whether those funds are being property [should be properly] used and whether regulations are being complied with.

In spite of my many, many emails, I believe that HUD has done no oversight at all.

102.    In an email dated December 23, 2008, Ms. Bush wrote:

Based on our previous conversation with the City regarding the status of the Skyland project, it is our understanding that because the Skyland project is in court, the City has not taken any further actions to develop the project at this time.  Again, regarding your request that the Skyland project be reevaluated in light of present economic conditions, the Department does not have the authority to require the City to reevaluate the project.  Should the City decide to reprogram funds previously approved for the Skyland Project in light of present economic conditions, the decision to reprogram funds must be presented to citizens of the District of Columbia for comment and to the Department for review and comment if the proposed changes are considered a substantial amendment.  At this time, the Department is not aware of any plans by the City to reevaluate its proposal for development of the Skyland project.

103.    Upon information and belief, HUD permits funds to be spent if the project is included in the District's Action Plan.

104.    Upon information and belief, HUD does not monitor whether spending on the Skyland project was consistent with the Action Plan or whether the Action Plan accurately described the purpose of the Skyland project and its completion date.

105.    Upon information and belief, the Action Plan does not indicate the total amount to be spent on a project.  The Action Plan shows the expenditures for a fiscal year and does not include a summary or analysis of expenditures for all years of a project. Thus, HUD has not reviewed or approved a total dollar amount for the Skyland project.

106.    Upon information and belief, HUD has not determined that the total amount to be spent on Skyland is a proper expenditure and meets the requirements of the HUD regulations.

107.    In a letter dated August 23, 2008, undersigned counsel wrote to Susan D. Peppler,

Assistant Secretary for Community Planning and Development, U.S. HUD, requesting that HUD conduct oversight of the Skyland project.  The letter described several issues, including whether the project will benefit low- and moderate-income persons and whether the appraisals were in compliance with USPAP and the Uniform Appraisal Standards for Federal Land Acquisitions.

108.    In a letter dated September 26, 2008, Susan D. Peppler, Assistant Secretary for Community Planning and Development, U.S. HUD, responded to the letter of undersigned counsel concerning Skyland.  Ms. Peppler wrote, "In response to your request for HUD oversight of the Skyland project, the Department's process for monitoring, management and oversight of CDBG program activities and ensuring grantee compliance with program policies and procedures, includes utilizing a risk analysis process to determine which grantees and programs should be monitored on an annual basis.  The Department has on several occasions responded to your concerns regarding the Department's real property acquisition procedures, the City's use of CDBG funds for economic development activities, and the program's national objective and low- and moderate-income benefit requirements."  Ms. Peppler stated that further questions should be directed to Frances W. Bush, Community Planning and Development Division Director in the HUD District of Columbia Field Office.  Ms. Peppler stated that Ms. Bush and her staff are responsible for oversight of the District of Columbia's CDBG program.

109.    In an email dated March 17, 2011, to several HUD officials, undersigned counsel wrote:

> Please advise me about the status of the Skyland project.  Also, I would like information about the HUD oversight of the appraisals used by the District of Columbia in the Skyland project, which uses CDBG funds.

110.    In an email dated March 17, 2011, Teresa M. Palladino wrote:

> I'm unable to assist you in your request.  As I am not a CPD staff person, I'm not the appropriate POC for CDBG or any other CPD program.

111.     HUD has released a number of documents to undersigned counsel in the course of pending Freedom of Information Act litigation.   The Bates Stamp identification for selected released documents is included herein.

112.     In an email dated June 13, 2011, from Yolanda Chavez (Bates Stamp 0006), Ms. Chavez wrote:

Do you know anything about this project?

113.     In an email dated June 14, 2011, from Steve Johnson (Bates Stamp 0006), Mr. Johnson wrote:

Paul Webster and Frances Bush are veeerrrryyyyyyy familiar with this project. Stan, too, probably, and this may even go back to Ron's days in the DCFO. The Skyland shopping center project has been bouncing around in the proposed stage for at least a decade without ever moving forward.

Ms. Mittleman is a chronic pen-pal.  She's a lawyer representing some of the tenants/property owners who oppose the project.  I expect the Financial Management Division and the DC Field Office have a file cabinet full of correspondence to/from her on Skyland.

114.     In an email dated June 14, 2011, from Paul Webster, Director, Financial Management Division (Bates Stamp 0006), Mr. Webster wrote:

The District of Columbia submitted an application for the Skyland project, but it was withdrawn in 2006.  If CDBG funds were used, the source would have been the District's CDBG entitlement or program income.

115.     In an email dated June 14, 2011, from Yolanda Chavez (Bates Stamp 0004), Ms. Chavez wrote:

How much was used in CDBG?  When did we ban the use of CDBG for econ dev?

116.     In an email dated June 14, 2011, from Stanley Gimont (Bates Stamp 0004), Mr. Gimont wrote:

To be clear, this was not an economic development project.  It was acquisition.

117.    In a letter dated June 17, 2011, undersigned counsel wrote to HUD Secretary Shaun Donovan, requesting oversight of the Skyland Shopping Center project.

118.    In a letter dated September 6, 2011, Yolanda Chavez, Deputy Assistant Secretary for Grant Programs, Office of Community Planning and Development, U.S. HUD, responded to undersigned counsel's letter to Secretary Donovan.  Ms. Chavez noted that "[y]ou provide legal representation for some of the property owners and tenants at the Skyland Shopping Center and have asked the Secretary to conduct oversight of the project and use of CDBG funds."  She explained that "HUD's oversight is limited to ensuring grantees adhere to applicable CDBG and federal requirements.  The Department has included the Skyland Shopping Center as a CDBG-assisted activity that it will monitor during this current fiscal year."

119.    In a letter dated February 17, 2012, Yolanda Chavez, Deputy Assistant Secretary for Grant Programs, Office of Community Planning and Development, U.S. HUD, stated that "the HUD Washington, DC Field Office scheduled the Skyland Shopping Center project for monitoring in 2011.  The field office has completed the monitoring visit and the monitoring report is forthcoming.  The field office's monitoring efforts for the Skyland Shopping Center focused on ensuring that the District of Columbia government complied with applicable CDBG program and federal requirements."

120.    Upon information and belief, HUD would not have monitored Skyland if undersigned counsel had not written the June 17, 2011, letter to HUD Sec. Donovan.

121.    Upon information and belief, the HUD monitoring of Skyland began after the June 17, 2011, letter to Sec. Donovan.  The monitoring occurred too late to ensure that the HUD regulations and guidelines were followed during the acquisition and appraisal process for

Skyland property owners and tenants, including plaintiffs.

122.    Upon information and belief, HUD and its employees failed to respond to requests and inquiries from undersigned counsel about the monitoring of Skyland and the need for appraisal reviews by monitoring Skyland in a timely manner, including during the condemnation process.

123.    Upon information and belief, HUD did not initiate monitoring of Skyland based on a risk analysis or assessment process.  It is not clear whether HUD assigned Skyland a risk assessment category or whether Skyland was included in the high-risk recipients subject to monitoring.

**HUD monitoring review at Skyland**

124.    On July 11-22, 2011, a team of HUD staff performed an on-site monitoring review of the District's expenditure of CDBG funds on a variety of redevelopment activities involving Skyland Shopping Center.  *See* Monitoring Report sent by letter dated December 13, 2012, to Michael P. Kelly, Director, Department of Housing and Community Development ("DHCD") from Michael D. Rose, Director, Community Planning and Development, HUD D.C. Field Office.

125.    The purpose of the monitoring was to ensure that the District was administering as well as expending HUD funds in compliance with applicable statutory and regulatory requirements.  The main focus of HUD's monitoring of Skyland Shopping Center activities was to ensure compliance in four key areas: 1) eligibility and national objectives; 2) record keeping; 3) financial management and oversight; and 4) relocation and acquisition.

126.    Upon information and belief, HUD conducted an oversight visit of the Skyland project as a result of undersigned counsel's letter to Secretary Donovan.

127.    There are handwritten notes (Bates Stamp 000001 – 000004) with the heading, "Other Information Needed."  The list includes the following:  # of parcels acquired w/ HUD funds during last 3 years – not just Skyland – everything; # of occupied properties rehabbed in past 3 years broken down as follows: Total # of units, # of tenant occupied, # of owner occupied; # of units demolished using HUD funds during last 3 years.

128.    The handwritten notes include a series of itemized questions about individual Skyland properties and businesses.  There are questions about review appraisals and summary statements.

129.    The monitoring visit included a review by the Regional Relocation Specialist to determine the City's compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended ("URA").  A discussion of the review about the City's compliance with the URA was prepared and made available in the FOIA litigation.  The document titled Relocation/Acquisition (Bates Stamp 000404) explained that:

> During the review, the Grantee produced pertinent relocation resources including, but not limited to, local fair market rent schedules, low-income limits, local code requirements as well as the URA's fixed moving allowance for Washington, D.C.  Through discussions and this review, it was evident that Washington, D.C.'s staff is aware of, but not necessarily sufficiently proficient in, the Federal acquisition/relocation requirements.  Staff did request that the Regional Relocation Specialist schedule a relocation/ acquisition training session for the City and its subrecipients prior to the end of this fiscal year.

130.    The monitoring included three cases which were involuntary acquisitions involving eminent domain or the possibility of eminent domain.  The owners of those properties are Peter DeSilva, Samuel Franco, and Ingak and Chong S. Lee.

**Discussions about preparation of monitoring letter about Skyland**

131.    The documents released by HUD in the FOIA litigation to undersigned counsel

include emails concerning undersigned counsel's inquiries about monitoring the Skyland project.

132.    One email, dated January 26, 2012 (Bates Stamp 0021), was from Steve Johnson,

Director, Entitlement Communities Division, Office of Block Grant Assistance, HUD HQ, to

Valerie S. Brown.  Mr. Johnson wrote:

> Please talk to the field office about the status of the monitoring letter.
> I think it's also worth asking about how this activity was supposed to
> meet a national objective.

133.    Another email dated January 26, 2012 (Bates Stamp 000701), was from Michael

D. Rose, to Valerie S. Brown, with the following names included as Cc's – Frances Bush, Renee

Ryles, Stanley Gimont, Steve Johnson.  Mr. Rose wrote:

> The Skyland report was submitted over last year to OBGA for review, edits and
> then eventual submission to the grantee – I think around October 2011.  You will
> have to talk to Stan regarding its status.

134.    There is an email dated February 5, 2012 (Bates Stamp 000714) from Peter

Werwath, Werwath Associates to Donna Clarke and Michael Rose.  Mr. Werwath wrote:

> Donna,
>
> We understand from one interview with John Hall that there were irregularities
> in the CDBG funding of Skyland shopping center's redevelopment that raised
> concerns with HUD.  But we haven't been able to get more details after
> emailing follow-up questions.  DHCD has been very conscientious about
> answering our questions but there is a backlog of a few unanswered questions
> now that we are about to complete the report.  We thought we should go
> straight to you to get information on HUD concerns, given the timeframe for
> submitting the CPD report.  We need to wrap up the report by Tuesday COB.
>
> Has HUD issued any written findings/concerns that you could share with us?
> We presume that this project was managed by the Deputy Mayor's office.
> Could you confirm that?

135.    Other emails concern responses to inquiries from undersigned counsel.  There is

an email dated April 30, 2012 (Bates Stamp 000722) from Steve Johnson to Jessie Handforth

Kome and Stanley Gimont. In response to an email from Jessie Handforth Kome about the status of the monitoring letter, Mr. Johnson wrote:

> Valerie is working on rewriting the letter but hasn't completed it yet.
>
> I think you just tell her [Ms. Mittleman] that HUD conducted monitoring last year and is still preparing the monitoring letter.

### Drafts of HUD Monitoring Report

136. There were numerous drafts of the HUD Monitoring Report. In an email dated October 12, 2012, from Valerie S. Browne (Bates Stamp 0052 - 0053), Ms. Browne wrote:

> Attached is the revised monitoring report. Please let me know if you have any questions.
>
> OBGA Version VI, Draft October 12, 2012
>
> The report is down to nine pages. The URA section is five and a half pages. As requested, I left the URA section untouched, except for minor formatting to conserve space.

137. There is a draft report dated July 17, 2012 (Bates Stamp 0054 – 0061). The introductory section (Bates Stamp 0054) explained:

> HUD is questioning all $28.5 million for the SSC [Skyland Shopping Center] activity number 1148, for failure to demonstrate compliance on multiple fronts. CDBG entitlement funds disbursed for other SSC related activities (activities 1511 – 1515, and 1517) may have violated the prohibition of using CDBG funds to support activities that employ eminent domain to seize land, unless that power is sought for certain public purposes. Failure to produce the records demonstrating compliance within 30 days from the date of the letter transmitting the monitoring report will result in HUD disallowing all costs and requiring reimbursement by the City.

138. The July 17, 2012, draft report included Attachment A (Bates Stamp 0062), which showed the Skyland Shopping Center activities that were identified in the HUD Integrated Disbursement and Information System (IDIS). The Attachment showed that $32,432,598.52 had been disbursed for seven of the eight Skyland Shopping Center activities.

139.   The July 17, 2012, draft report included a finding about eminent domain (Bates

Stamp 0055-0056).  The discussion about this finding was as follows:

Finding 2:  The City has used the power of eminent domain for the
purpose of acquiring properties for the SSC project.  CDBG grantees
may not use CDBG funds to support activities that employ the power
of eminent domain, unless that power is sought for certain pubic purposes.

Condition:  The City violated the Federal statutes appropriating CDBG
funds, commencing with the FY2006 Federal appropriations, Public Law
109-115.  The Federal Register Notice, Statutory Prohibition on Use of
HUD Fiscal Year 2006 Funds for Eminent Domain-Related Activities
was published on July 17, 2006.  These statutes include a prohibition
on the use of CDBG funds to support any Federal, state or local project
that seeks to use the power of eminent domain, unless that power is
sought for certain public purposes.  Public purposes are not be to
construed to include economic development, which primarily benefits
private entities.

Criteria:  Public Law 109-115 appropriating HUD funds in 2006 and
Fiscal Years 2007-2010 Appropriations Acts.

Cause:  A review of the IDIS (Integrated Disbursement and Information
System) PR05, Drawdown Report by Project and Activity, for the eight
SSC activities listed on Attachment A indicates that CDBG entitlement
funds (IDIS fund type EN) totaling $2,185,150.62 were used for the
following SSC activities:

1.  IDIS Activity 1511 - $25,934.91 drawn from grant B-08-MC-11-0001
    for relocation.
2.  IDIS Activity 1512 - $780,000 drawn from grant B-06-MC-11-0001
    for the KFC acquisition.  The IDIS activity description states that the
    funds are to be used for the acquisition of the KFC business through
    the District's power of eminent domain.
3.  IDIS Activity 1513 - $857,046.43 drawn from B-07-MC-11-0001
    for disposition services.
4.  IDIS Activity 1514 - $5,788.88 drawn from B-08-MC-11-0001
    for relocation.
5.  IDIS Activity 1515 - $298,280.40 drawn from B-08-MC-11-0001
    for disposition services.
6.  IDIS Activity 1516 - $166,000 drawn from B-08-MC-11-0001
    for the Auto Zone acquisition.

See Attachment C for the Drawdown Report by Project and Activity for
each activity listed above.

Effect:  CDBG funds were used in violation of Federal statutes appropriating CDBG funds.

Corrective Action:  Within 30 days of receipt of the monitoring report, provide documentation to demonstrate that CDBG funds were used in accordance with applicable Federal statutes or reimburse the CDBG program the $2,185,150.62 for funds used in violation of the Federal statutes pertaining to eminent domain.

140.    This finding that CDBG funds were used in violation of Federal statutes appropriating CDBG funds and the related discussion were omitted from the final Monitoring Report.

141.    There is another draft report dated June 19/20, 2012.  It included changes from the draft of May 16, 2012.  This draft was marked with numerous comments.  The comments that are handwritten are described here with the assumption that the handwriting can be read accurately.

142.    The June 20, 2012, draft included a handwritten comment on page 1 (Bates Stamp 0078), which stated:

The transmittal letter itself, if not the monitoring report, needs to say very clearly that we are questioning all $28 million for noncompliance/failure to demonstrate & document compliance on multiple fronts: URA, national objectives, recordkeeping, etc.; failure by DC to produce the records to show compliance by date X means HUD will require reimbursement of the entire amount.

143.    The June 19, 2012, draft report explained at page 2 (Bates Stamp 0079) that the expenditure of CDBG funds for Skyland has not met a national objective because the project has not been completed.  A handwritten note at page 3 (Bates Stamp 0080) stated:

Why aren't we pulling the plug?  Tell the city, "demonstrate how this has met a national objective or repay any $ that does not meet a nat. obj.

144.    The June 19, 2012, draft report included at page 7 (Bates Stamp 0084) a discussion about Skyland vouchers review.  The comments included the following:

> Skyland Voucher Review.  Nine vouchers were reviewed.  Please include
> the total sum of all vouchers.  It is approximately $23.4 million. …
> For voucher DE4113698 listed under item 1, the report states that the
> $2,455,725 draw was to be made payable to the purchaser RLARC
> to acquire the property located at 2650 Naylor Road.  What entity
> is the current owner of the property?
> For voucher DE159948, item 7, $2.51 million was for the reimbursement
> of the difference between the deposit and the compensations for
> properties on Alabama Avenue.  How does this $2.51 million break
> out by property address?

145.    The draft report included at page 8 (Bates Stamp 0085) a discussion about the anticipated land disposition agreement.  The report indicated that HUD was informed that the City would negotiate the land disposition agreement during the fall of 2011.  Also, a review of HUD's PR05 report showed that the land purchased for samples 1-3 totaling $15,942,303 was documented in IDIS as closed, even though the Skyland project was not completed.  Based on how the City presented the project when it was originally approved and funded for CDBG funds, HUD has determined that the city did not meet a national objective for completed Skyland Shopping Center activities.

146.    The draft report included at pages 13-14 (Bates Stamp 0090-0091) a discussion about the noncompliance with the URA requirement concerning records about assistance to displaced persons and owners.  The comment at page 14 (Bates Stamp 0091) stated:

> Since there is widespread, repeated noncompliance with the URA, why is the
> corrective action to do it correctly in the future?  Why are we not requiring
> corrective actions on these and other Skyland relocations?  Why are we not
> disallowing their expenditures on relocation services?  This also applies
> to findings 8 and 9.

147.    Another draft (date unknown) included numerous findings.  Finding #3 (Bates Stamp 0065) stated:

> DHCD did not provide the supporting documentation for the PI
> (program income) expenditure draw in the amount of $429,408.89.
> …

Corrective Action:  HUD is requesting that the City reimburse its
program account in the amount of $429,408.89 within 60 days of
the receipt of this letter.

Finding #5 (Bates Stamp 0066) stated:

The City did not provide all of the supporting documentation for 8 out of 9
sampled vouchers.  In addition, the City did not provide Land Disposition
Agreements (LDAs), HUD 1 Forms or Settlement sheets for the sampled
acquisitions amounting to $22,590,355.
…
Corrective Action:  HUD is requesting the City reimburse its program
account of $22,590,355 in unsupported expenditures and costs.  The
City could not provide Deed of Trust, LDAs, the HUD1 Settlement
forms as well as other evidence that the properties were acquired.

148.    In an email dated October 11, 2012 (Bates Stamp 0076), from Deborah L. Davis

to Valerie S. Brown, Ms. Davis wrote:

Val don't know if this will help but I revised the section that was of concern.

Finding #5:  The City did not provide all of the supporting documentation
for 8 out of 9 sampled vouchers.  In addition, the City did not provide
Land Disposition Agreements (LDAs), HUD1 Forms or Settlement
sheets for the sampled acquisitions amounting to $22,590,355.
…
Corrective Action:  HUD is requesting the City reimburse its program
account of $22,590,355 in unsupported expenditures and costs.  The
City could not provide Deed of Trust, LDAs, the HUD1 Settlement
forms as well as other evidence that the properties were acquired.
Also the voucher samples for land acquisitions 1-3 totaling $15,942,303
are documented in IDIS as closed and the Skyland project is not
completed so the District should be re-open these activities in IDIS
since it is not clear if the national objective has been met and did not
provide proper supporting documentation.

**HUD Monitoring Review Letter**

149.    In a letter dated December 13, 2012, to Michael P. Kelly, Director, Department of

Housing and Community Development ("DHCD"), HUD provided the results of the monitoring

of the Skyland Shopping Center project.

150.    The letter from Michael D. Rose, Director, Community Planning and Development, HUD D.C. Field Office, stated that:

> The review focused primarily on four key areas of compliance: 1) eligibility and national objectives; 2) record keeping; 3) financial management and oversight; and 4) relocation and acquisition.  The enclosed monitoring report provides the results of this review.

> Based upon our review, there were six (6) findings.  A finding is a determination of non-compliance with a program regulation that requires a corrective action. The city must provide responses to the findings and other material noted in the enclosed report consistent with the time frames specified in the letter.

151.    The Monitoring Report attached to the letter included a project overview at page 1.  The project overview explained that:

> The NCRC was a publicly chartered corporation charged with spurring the revitalization of underserved and emerging neighborhoods in the District of Columbia through strategic business and real estate development and partnerships designed to enhance job creation, community amenities and citizen empowerment.  Through local law (D.C. Law 15-286, effective April 5, 2005), the District enabled NCRC to commence with eminent domain procedures to acquire the properties that are part of the Skyland site.  The RLA Revitalization Corporation (RLARC), a subsidiary of the NCRC was responsible for carrying out the development activities.

> Starting in 2005, the District provided $28,700,000 of CDBG funds to RLARC to acquire 44 parcels for phase 1 of a multi-stage acquisition plan through both voluntary sales and eminent domain actions.  However, in 2007, the District dissolved NCRC/RLARC and delegated its authorities and transferred all assets to the Office of the Deputy Mayor for Planning and Economic Development (ODMPED).

> The District stated that ODMPED has been using and plans to continue to use CDBG to conduct: (1) acquisition of property through the condemnation cases; (2) property maintenance pending redevelopment; (3) demolition and clearance on-site; (4) environmental remediation; and (5) relocation services and payments to existing businesses/commercial tenants on-site. All ODMPED CDBG activities are approved and monitored by the DHCD and setup in HUD's Integrated Disbursement and Information System (IDIS) accordingly.

152.    The Monitoring Report included a section on CDBG program compliance review.

The Monitoring Report at page 2 explained that:

> Overall, HUD finds that implementation of the Skyland project has been
> problematic since its inception in 2002.  While the DHCD has long been
> responsible for management of the District's CDBG funding, NCRC and
> RLARC were tasked to undertake the Skyland project but appear to have
> been less than diligent in following applicable CDBG and other Federal
> requirements in the execution of the project.  Most notably, the lack of
> available records with regard to actions taken by NCRC and RLARC
> makes it difficult for HUD to develop a complete compliance picture.
> Given the dissolution of NCRC and RLARC in 2007, it is impossible at
> this time to hold those entities accountable and HUD must look to DHCD
> as the responsible entity for the Government of the District of Columbia.
>
> Further, the lack of available records at the time of the review hindered
> HUD's ability to make judgments with respect to a range of issues
> associated with the Skyland project.  While certain information regarding
> the project is available to HUD through IDIS, all such information must
> be thoroughly supported by paper records in the possession of the District.
> The failure to produce these records at the time of the review establishes
> a basis for HUD to question virtually all expenditures associated with
> the Skyland project.  To the extent the District can produce original
> records and documentation, HUD will review such documentation and
> may revise its findings.

**Findings in the Monitoring Report**

153.    The Monitoring Report discussed Finding #1 at page 2.  Finding #1 stated:

> The District was unable to produce records required pursuant to 24 C.F.R.
> 570.506(a) to support the expenditure of $28,509,299 in CDBG funds for
> the Skyland project.  The failure to maintain this documentation also
> represent failure to comply with 24 C.F.R. 85.22 regarding allowable costs.

154.    The Monitoring Report listed documentation that was requested by HUD and was

not provided by the District.  The list of documentation not provided included (not all types

listed here): appraisals, including review appraisals; sales contracts, declarations of taking; land

disposition agreements; court orders showing date and outcome of condemnation proceedings;

deeds of trust to verify current ownership; and status of parcel.

155.    The effect and corrective action for Finding #1 were described as follows:

Since HUD cannot verify the use of the CDBG funds due to the lack of appropriate records, HUD must determine that the $28.5 million expended for IDIS activity 1148 is unsupported.

Within 45 days of the date of this letter, the District must provide documentation to verify the expenditure and eligible use for all of CDBG funds drawn down for the Skyland under IDIS activity 1148.   …  Failure to produce appropriate documentation in a timely manner may result in <u>HUD advising the District to reimburse from non-Federal funds its CDBG line of credit for an amount up to $28,509,299</u>.

Further, HUD is also directing that DHCD develop policies and procedures to maintain CDBG project files in accordance with program regulations.  DHCD officials are to provide these policies and procedures to HUD for review within 60 days of the date of this letter.

Further, HUD is also directing that DHCD develop policies and procedures to maintain CDBG project files in accordance with program regulations.  DHCD officials are to provide these policies and procedures to HUD for review within 60 days of the date of this letter.

156.    The Monitoring Report described at page 3 the concern about compliance with a

national objective, which is related to Finding #1, as follows:

The lack of documentation for the Skyland project raises a concern with regard to national objective compliance pursuant to 24 CFR 570.208. While IDIS activity 1148 indicates that the national objective to be met is low- and moderate-income benefit on an area basis, the lack of documentation and the lack of progress in implementation make it difficult to determine whether a national objective can be met by the project.  HUD recognizes that there have been substantial delays in implementation of the project but the expenditure of CDBG funds must ultimately meet a national objective of the program.  It may be necessary to change the national objective to low- and moderate-income benefit based on the creation and/or retention of jobs if the area benefit approach is not applicable.  HUD will reserve judgment on this particular point pending receipt of the documentation requested under Finding #1 and a detailed written justification as to how the project will meet a CDBG national objective.  The written justification should be provided to HUD within 60 days of the date of this letter. Failure of the Skyland project to ultimately meet a CDBG national objective may result in HUD advising the District to reimburse its CDBG program account with funds from a non-Federal source.

157.    The Monitoring Report discussed Finding #2 at page 3.  Finding #2 stated:

The District is not receipting and/or drawing down the correct amount
of program income from IDIS.  Also, the District has not implemented
CDBG policies and procedures that include the program income
reconciliation process of IDIS to the District's System of Accounting
and Reporting (SOAR) outlined in the District's FY 2008 monitoring
response.

158.    The Monitoring Report discussed Acquisition and Relocation at pages 4-7.  The

Report stated:

During the monitoring visit, HUD's Regional Relocation Specialist reviewed
six Skyland project files to determine the District's compliance with the
Uniform Relocation Assistance and Real Property Acquisition Policies Act
of 1970, as amended (URA).  Three cases reviewed were involuntary
acquisitions resulting in an eminent domain taking or the possibility of
an eminent domain taking.  Three different findings arise from this review,
all related to procedural aspects of the URA, but none involve financial
sanctions.  Generally, however, the information provided was insufficient
to adequately complete the review and the District is requested to provide
the information as set forth below.  Be advised that additional findings
or requests for information may be appropriate based on a review of the
requested information.

| Address | Current/Former Owner | Business Occupant | Business Owner |
| --- | --- | --- | --- |
| 2838 Alabama Av., SE | Samuel Franco | Discount Mart | Samuel Franco |
| 2712 Good Hope Rd, SE | Ingak & Chong S. Lee | Hill Top Cleaners | Ingak, Chong Lee |
| 2648 Naylor Rd., SE | Peter DeSilva | Skyland Liquors | Rose, Joseph Rumber |

159.    The discussion for 2648 Naylor Rd., SE (Peter DeSilva, Owner) (Joseph and Rose

Rumber, Tenants), stated:

Acquisition Issues – Although Mr. DeSilva received a "Notice to the Owner,"
the file contained no documentation that the notice was delivered in the
appropriate manner (Finding – 49 CFR 24.5).  Three appraisals were conducted
to determine the property's value but no review appraisal was found in the
file to verify these values as required by 49 CFR 24.104.  An "Offer of Just
Compensation" based on these appraisals was proffered on February 22, 2005,
but did not contain a Summary Statement nor was it delivered in accordance
with the URA (Findings – 49 CFR 24.102(e) and 49 CFR 24.9 (respectively)).
The District must produce the review appraisal for HUD to complete its
review of this transaction.

Relocation Issues – On June 21, 2006, Joseph and Rose Rumber, owners of Skyland Liquors, were informed by letter that the property which they leased would be acquired as part of the Skyland redevelopment project and that they would receive assistance with the relocation of their business. After discussing the relocation options presented to them, the Rumbers decided not to move their business but to accept a fixed business payment in lieu of being relocated. However, during the monitoring visit, the District could not produce the following information [list omitted here] for the relocation transaction.

The lack of availability of this documentation constitutes a finding of noncompliance with 49 CFR 24.9 and constitutes a finding. To complete the review of this case and determine whether the displaced business received the assistance as required by the URA, the District must gather the above-listed documentation and provide it to HUD within 45 days of this letter for further analysis. The results of this analysis may determine additional findings or concerns.

160.    The Monitoring Report discussed Finding #3 at page 6. Finding #3 stated:

In several cases, the District failed to adequately maintain (or make available) records of its acquisition and displacement activities in sufficient detail to support assistance (monetary and advisory) provided to displaced persons and/or owners whose properties were acquired.

This is in noncompliance with 42 CFR 42.9 of the URA regulations. The effect is that HUD is unable to access documentation to verify assistance provided to affected parties.

161.    The Monitoring Report discussed Finding #4 at page 6. Finding #4 stated:

Summary statements were not provided to owners whose respective properties (2712 Good Hope Rd., SE and 2648 Naylor Rd., SE) were taken through the involuntary process.

This is in noncompliance with 49 CFR 24.102(e) of the URA regulations. The District was unaware that it was required to provide such information within "Offers of Just Compensation." The effect is that owners were not advised of the basis for the respective "Offers of Just Compensation."

162.    The Monitoring Report discussed Finding #5 at pages 6-7. Finding #5 stated:

Acquisition and relocation notices were not delivered in the appropriate manner with regard to the involuntary acquisitions of 2838 Alabama Ave, SE, 2712 Good Hope Rd., SE and 2648 Naylor Rd., SE.

47

This is in noncompliance with 49 CFR 24.5 of the URA regulations.  The District failed to personally serve notices or have them sent by certified/registered first-class, return receipt mail and documented within the Agency's files. The effect is that the files did not contain documentation that affected owners/occupants received required acquisition/relocation notices. The Monitoring Report discussed Finding #6 at page 7.  Finding #6 stated:

The District's Consolidated Plan did not define living units that are of "Standard Condition" or "Substandard Condition but Suitable for Rehabilitation."

This is in noncompliance with 49 CFR 42.305 of the URA regulations and 24 CFR 91.205(b)(1) of HUD's Consolidated Plan regulations.  The effect is that the District is at risk of misevaluating and not replacing affordable units that were lost through acquisition, conversion or demolition.  This failure puts the District at risk of failing to comply with the anti-displacement and relocation plan required under section 104(d) of the Housing and Community Development Act of 1974 (HCD Act).

### HUD's emails after the release of the Monitoring Report

163.    There were emails among HUD officials after the release of the Monitoring Report.  One email, dated December 19, 2012 (Bates Stamp 0029), was from Mark S. Walling, to staff.  Mr. Walling wrote:

FYI – The link below is a copy of the monitoring letter from the DC Field Office on a long-outstanding activity known as the "Skyland Shopping Center".  The activity involved a large subrecipient created by congress that was dissolved for lack of records.  The activities were: acquisition and land assemblage (some by eminent domain), relocation, and the re-development of a new shopping center on the newly designed site.  The findings made by the DCFO illustrate the importance of maintaining adequate documentation and records for real estate deals, which at times can be quite complex.

If anyone knows how to convert the link content into a WORD document, please advise.  It could be filed in several policy folders for future use.

164.    Another email, dated December 19, 2012 (Bates Stamp 0031), was from Steve Johnson to a number of recipients.  The subject was "FW: HUD Monitoring Report – Skyland Shopping Center."  The importance was "High."  It appears that this email was used to forward the Monitoring Report.

**HUD's follow-up to the Monitoring Report**

165.    The HUD Monitoring Letter to Michael P. Kelly is dated December 13, 2012. The letter contained numerous deadlines and follow-up requests.  For example, the discussion about acquisition and relocation in the Monitoring Report at page 4 stated:

> Generally, however, the information provided was insufficient
> to adequately complete the review and the District is requested to provide
> the information as set forth below.  Be advised that additional findings
> or requests for information may be appropriate based on a review of the
> requested information.

166.    The HUD Monitoring Report discussed at page 5 the acquisition of Peter DeSilva's property.  The Report explained that there were no appraisal reviews by stating:

> Three appraisals were conducted to determine the property's value but no
> review appraisal was found in the file to verify these values as required
> by 49 CFR 24.104.  …  The District must produce the review appraisal
> for HUD to complete its review of this transaction.

167.    The Report explained that three appraisals were conducted concerning Mr. DeSilva's property.  However, the Report did not identify those three appraisals.  The Report did not indicate whether one of those appraisals is the subsequent appraisal performed in 2008.

168.    Upon information and belief, HUD has not followed up on its instruction that the District must produce the review appraisal for Mr. DeSilva's property.

169.    Upon information and belief, HUD has not completed its review of the transaction concerning the acquisition of Mr. DeSilva's property.

170.    Upon information and belief, HUD has not reviewed whether the appraisals for Mr. DeSilva's property are in compliance with HUD regulations and appraisal standards.

171.    Upon information and belief, HUD has not reviewed or analyzed the 2008 appraisal and the issues involving the District's use of this appraisal, which had a much lower value estimate, in place of the appraisal used in the offer of $600,000 that was presented to Mr.

DeSilva by letter dated February 22, 2005.

172.   Upon information and belief, Rose and Joseph Rumber have suffered severe financial hardship, including the loss of their business.  HUD has not reviewed or analyzed the transactions with the Rumbers to determine whether there was compliance with HUD regulations.

173.   Upon information and belief, Marion Fletcher has suffered financial hardship, including the loss of her business.  HUD has not reviewed or analyzed the transactions with Ms. Fletcher to determine whether there was compliance with HUD regulations.

**Media discussion of Monitoring Report**

174.   The Monitoring Letter included deadlines by which the D.C. Department of Housing and Community Development was to provide additional documents to the HUD Washington Field Office.  The District's response to the monitoring letter was discussed in the media.  *See* Michael Neibauer, *D.C. responds to HUD on Skyland, seeking to avoid a $28M slap*, Washington Business Journal, March 1, 2013 (available at

http://www.bizjournals.com/washington/blog/2013/03/dc-responds-to-hud-on-skyland.html).

The article explained:

Binders full of records showing that D.C.'s use of federal funds for acquisition of Skyland Shopping Center was by-the-book and properly documented are now in the hands of the U.S. Department of Housing and Urban Development.
…
The binders provided to HUD support $28,457,135 of the $28,509,299 in block grant funds expended on Skyland, leaving an undocumented balance of $52,164.
…
HUD did not provide the District housing department with a date for its follow-up review, but D.C. is likely in the clear and won't have to repay the $28 million.

175.   A previous article in the Washington Business Journal had described the monitoring letter and its requirement that the District submit records to HUD or face the possibility of repaying $28 million.  *See* Michael Neibauer, *Missing records tied to Skyland Shopping Center acquisition may cost D.C. $28M*, Washington Business Journal, December 17, 2012 (available at

http://www.bizjournals.com/washington/breaking_ground/2012/12/missing-records-tied-to-skyland.html?s=print).

176.   An email from John Hall dated December 18, 2012 (Bates Stamp 000733), to Michael Rose attached that article.  The article quoted Michael Rose, Director of Community Planning and Development in HUD's D.C. field office, in the monitoring letter as saying, "The failure to produce these records  at the time  of the review  establishes  a basis  for HUD to question virtually all expenditures associated with the Skyland project."  The email from John Hall to Michael Rose included the message, "Great quote!!" It is not clear which quote the message referred to or whether it simply was referring to the entire article.

177.   The subject line of the email message stated, "FW: Hot Article: Missing records tied to Skyland Shopping Center acquisition may cost D.C. $28M."  The email message described the importance as "High."

**Effect on property and business owners of having their property taken**

178.   The property owners, business owners and tenants were harmed by having their property taken with HUD funds.  Those persons, including plaintiffs, lost their property, their businesses, the goodwill from their businesses and income, including rental payments.  Upon information and belief, the payments made to them, including payments for taking their property and for relocation or closing their businesses, did not fully compensate them for their losses.

179.    Plaintiff Peter DeSilva was treated unfairly when the District substituted an appraisal with a much lower fair market value estimate.  This appraisal was substituted in 2008, long after the offer to purchase was given to Mr. DeSilva in 2005.  Upon information and belief, the substitution of a much lower appraisal at a later time period violates HUD regulations.  In addition, there was no appraisal review for the appraisals on Mr. DeSilva's property.

180.    Plaintiff Peter DeSilva lost the rental income he had been receiving from the Rumbers for their lease on his property to operate Skyland Liquors.

181.    Upon information and belief, Rose and Joseph Rumber have suffered severe financial hardship and the loss of their business.

182.    Upon information and belief, plaintiff Marion Fletcher lost her business and the women who rented chairs in her salon lost their place to work.

**Titles for Skyland properties**

183.    HUD has failed to monitor the adequacy and status of titles to the Skyland properties.  The Monitoring Report at page 2 listed documents that had not been provided by the District.  The documents not provided included deeds of trust to verify current ownership and documents about the status of the parcels.

184.    The Project Data Summary, September 2005 (Bates Stamp 000375), stated that RLARC proposed to utilize up to $28,700,000 of its CDBG program income to finance the acquisition of the Skyland Shopping Center.  It stated that RLARC will own the land and the buildings in question.  The response (Bates Stamp 000376) to the question as to what type of business would be assisted was "RLARC, the non-profit subsidiary of NCRC is the business being assisted."

185.    Upon information and belief, there are Skyland properties for which the Recorder

of Deeds records show that the last transfer of the property was to RLARC.  However, RLARC was abolished in 2007.

186.    The June 19, 2012, draft report included at page 7 (Bates Stamp 0084) a discussion about Skyland vouchers review.  The comments noted that a $2,455,725 draw was to be made payable to the purchaser RLARC to acquire the property located at 2650 Naylor Road. The comments then asked what entity is the current owner of the property.

187.    The Recorder of Deeds records show that the deed transferring the property at 2650 Naylor Road, S.E., to RLARC on December 8, 2005, is the most recent deed.

188.    Upon information and belief, the Recorder of Deeds records include a record filed on February 28, 2006, which is described as a trust with grantors, Chong S. Lee and Ingak Lee, and grantee, RLA Revitalization Corporation, for the property at 2712 Good Hope Road, S.E. There is no more recent transfer or deed in the Recorder of Deeds records for the property at 2712 Good Hope Road, S.E.

189.    In an email dated July 21, 2011, to Michael Szupper (Bates Stamp 000051 – 000052), Nimita Shah, Project Manager, District of Columbia Office of the Deputy Mayor for Planning & Economic Development, stated that, for the property which had been owned by Chong S. Lee and Ingak Lee, the title vested with the Deputy Mayor for Planning & Economic Development (DMPED) on February 16, 2006.

190.    The trust document, filed on February 28, 2006, shows the grantee as RLA Revitalization Corporation.  There is no Recorder of Deeds document showing that title for 2712 Good Hope Road, S.E., vested with DMPED.  The statement by Ms. Shah that title vested with DMPED on February 16, 2006, is not supported by the Recorder of Deeds records.

191.    The Recorder of Deeds records include an order filed on March 9, 2007, for the

property at 2648 Naylor Road, S.E.   This order shows that the grantor was National Capital Revitalization Corporation and the grantee was Peter DeSilva.   There is no record for this property [Square 5632 Lot 0005] of a deed transferring the property to the District of Columbia, RLARC or DMPED.

192.     Upon information and belief, a number of the Skyland property records have not been properly filed and recorded with the Recorder of Deeds.

193.     Upon information and belief, there are not proper records which show that the District or DMPED has a vested or clear title for a number of the Skyland properties.

194.     Upon information and belief, HUD has not monitored whether there is proper title for the land acquisitions involving Skyland.

195.     Upon information and belief, HUD funds have been used for land acquisition without any verification by HUD that the land acquisition process was proper and complete and whether title vested.

196.     The Monitoring Report, which was released on December 13, 2012, described at page 2 the documentation that was requested by HUD and was not provided by the District.   The documents requested include appraisals, including review appraisals, and deeds of trust to verify current ownership.

197.     Records involving acquisition and improvement of real property must be kept for five years after closeout of a grant, as required by 24 C.F.R. § 570.489(j)(2).   Upon information and belief, HUD has failed to ensure whether the District has the proper records involving the Skyland properties.   The failure to keep records involving acquisition and improvement of real property is not in compliance with 24 C.F.R. § 570.489(j)(2).

**National objective**

198.    HUD has failed to monitor the requirement that the Skyland project meet a national objective, as required by as required by 24 C.F.R. § 570.208.

199.    An email from a HUD official discussed the question of meeting a national objective.  The email dated January 26, 2012 (Bates Stamp 0021), from Steve Johnson, Director, Entitlement Communities Division, Office of Block Grant Assistance, HUD HQ, to Valerie S. Brown stated:

> Please talk to the field office about the status of the monitoring letter.
> I think it's also worth asking about how this activity was supposed to
> meet a national objective!"

200.    Ms. Browne responded to that email with an email dated January 26, 2012 (Bates Stamp 0021), to Michael D. Rose and Steve Johnson, which stated:

> Mike,
>
> See the email below regarding the status of the Skyland Shopping Center
> monitoring letter and the national objective.

201.    Michael D. Rose replied to Ms. Browne by an email dated January 26, 2012 (Bates Stamp 0021), which stated:

> The Skyland report was submitted over last year to OBGA for review, edits
> and then eventual submission to the grantee – I think around October 2011.
> You will have to talk to Stan regarding its status.

202.    The June 19, 2012, draft report explained at page 2 (Bates Stamp 0079) that the expenditure of CDBG funds for Skyland had not met a national objective because the project has not been completed.  A handwritten note at page 3 (Bates Stamp 0080) stated:

> Why aren't we pulling the plug?  Tell the city, "demonstrate how this
> has met a national objective or repay any $ that does not meet a nat. obj.

203.    Upon information and belief, HUD does not verify whether the certification by

the grantee about meeting a national objective is correct or supported by proper documentation.

204.   Upon information and belief, HUD does not have a procedure to determine whether the national objective is correct or supported by proper documentation when the project is being funded and carried out.

205.   Upon information and belief, HUD's failure to monitor or determine whether a project meets a national objective until after the expenditures have occurred and the project has been in progress for a substantial time period violates the requirement that projects meet a national objective.

**Census tract for Skyland project**

206.   The census tract for the Skyland project is 0076.04.   Upon information and belief, the data for census block groups for the area of the Skyland project was not collected and relied upon to justify the national objective of benefiting low- and moderate-income persons in an area benefit activity.

207.   Upon information and belief, the census block group in which the Skyland project is located is not a CDBG eligible block group.

208.   Upon information and belief, HUD has not reviewed the data for census block groups for the Skyland project to monitor or determine whether the Skyland project meets the national objective of benefiting low- and moderate-income persons in an area benefit activity.

**URA Compensation is Inadequate**

209.   The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq., provides some compensation for relocation expenses to displaced  merchants and  business owners.   HUD Handbook 1378 describes general relocation requirements at Chapter 2.   The Handbook states:

Consistent with the goals and objectives of the applicable HUD program,
Agencies shall assure that they take all reasonable steps to minimize
displacement as a result of the project. …

Early, common sense planning is necessary to ensure that sufficient funds
will be budgeted to comply with applicable law and regulations.  Relocation
assistance is costly and can seriously affect the viability of a project.

210.    The URA statute contains strict limits to permitted compensation.  It does not
purport in any sense to provide "just compensation" to merchants and business owners.  *M/V
Cape Ann v. U.S.*, 199 F.3d 61, 65  (1st Cir. 1999) (under the URA, the government need not
provide a suitable alternate location for displaced businesses, but rather must advise displaced
businesses of the availability of such sites).

211.    The URA does not provide full compensation for business owners and tenants.
They do not receive goodwill or any compensation for losing their business.  They essentially
receive only a limited amount of relocation expenses.  *See Eminent Domain, Information about
Its Uses and Effect on Property Owners and Communities is Limited*, GAO Report, GAO-07-28,
November 2006 (available at http://www.gao.gov/new.items/d0728.pdf). The GAO Report noted
that the benefits under the URA, including relocation payments, are inadequate.  It stated that
"many government officials we spoke with said that certain benefits provided under the URA,
such as actual moving costs and expenses in finding a replacement site for businesses, to
displaced individuals and businesses may not offer adequate compensation under certain
circumstances."  GAO Report, p. 46.

212.    Upon information and belief, plaintiffs Rose and Joseph Rumber, Marion Fletcher
and other business owners did not receive adequate compensation for the loss of their businesses.

**HUD's failure to monitor enables District also to fail to monitor compliance**

213.    Upon information and belief, HUD's failure to monitor compliance with CDBG

requirements and regulations enables the District and its agencies also to fail to monitor and ensure compliance with CDBG requirements and regulations.  If the HUD monitoring occurs after the funds have been expended, then any remedy or compliance becomes more difficult. The delay by HUD in monitoring and requiring compliance permits the District and its agencies to neglect and fail to carry out requirements, regulations and oversight of projects.

### HUD's failure to monitor the cost of the Skyland project

214.    Upon information and belief, the District has used about $38 million in CDBG funds for the Skyland project.

215.    Upon information and belief, HUD has failed to monitor the amount spent on Skyland to determine whether the funds were spent based on a budget or projected cost of the project.

216.    Upon information and belief, HUD has not approved or monitored the total amount to be spent on the Skyland project

217.    Upon information and belief, HUD has failed to monitor the Skyland project to determine or review whether it is within the spending amount budgeted for the project.

218.    Upon information and belief, HUD has failed to monitor the Skyland project to determine or review whether the project is being completed in a timely manner and in compliance with any timeline or completion deadline.

### Transfer of Skyland property to developers

219.    Upon information and belief, the District is planning to transfer the Skyland properties to private developers, including Gary Rappaport.  HUD has failed to monitor this proposed transfer and has failed to determine whether the District is in compliance with CDBG and URA regulations before the properties are transferred.

220.     There is a bill pending in the District of Columbia Council to transfer the Skyland properties to the private development team.  A hearing on Bill 20-382, the Skyland Town Center Omnibus Act of 2013, was held before the District of Columbia Council on October 29, 2013.

221.     The purchase price for the property for the developers is $700,000.   Upon information and belief, this purchase price is based on an appraisal dated December 14, 2012, for Skyland property of 18.5419 acres.  The appraisal valued the property at $300,000 to $1,100,000.

222.     Upon information and belief, the appraisal with an opinion that 18.5419 acres has a value of $300,000 to $1,100,000 is not credible and is based on incorrect assumptions.

223.     Upon information and belief, the appraisal cannot be credited to establish the fair market value of the Skyland property.

224.     Upon information and belief, HUD has failed to monitor the proposed transfer to private developers and has failed to determine whether the transfer and purchase price comply with HUD regulations.

225.     Upon information and believe, HUD has failed to monitor the Skyland project to determine or review whether the transfer of the Skyland property to developers is or will be at a price that is in compliance with CDBG regulations and, if required, is a fair-market value price.

226.     Upon information and belief, HUD does not have a process by which it monitors the transfer of property to private persons before the transfer is finalized to determine if the transfer is in compliance with CDBG regulations and whether the transfer is at the required and fair price, such as a price at fair-market value.

### Wal-Mart as anchor tenant at Skyland

227.     The proposed Skyland project has Wal-Mart as the anchor tenant.

228.     There has been considerable discussion and controversy about Wal-Mart opening

stores in the District. An article in The Washington Post explained that "the company's larger PR scuffles are well-known. There's the issue of worker pay, along with the political fight locally over minimum wage regulations. There are persistent concerns from unions and the belief that small businesses around it will collapse from the competition." *See* Clinton Yates, *A culture of corporate at Wal-Mart*, The Washington Post, December 4, 2013 (available at http://www.washingtonpost.com/blogs/local/wp/2013/12/04/a-culture-of-corporate-at-wal-mart/?tid=auto_complete).

229.    The Skyland project is intended to benefit the Hillcrest neighborhood. *See* Audrey Hoffer, *Hillcrest is Southeast Washington's answer to Cleveland Park*, The Washington Post, November 29, 2013 (available at http://www.washingtonpost.com/realestate/neighborhood-profile-hillcrest-southeast-washingtons-answer-to-cleveland-park/2013/11/27/e84b36d4-3cfe-11e3-a94f-b58017bfee6c_story.html).

230.    In December 2013, Wal-Mart opened the first two of the planned stores in the District of Columbia. *See* Aaron C. Davis and Mike DeBonis, *Wal-Mart opens first two District stores*, The Washington Post, December 4, 2013 (available at http://www.washingtonpost.com/business/capitalbusiness/wal-mart-opens-first-two-district-stores/2013/12/04/b9a601c2-5c63-11e3-be07-006c776266ed_story.html).

231.    Mayor Vincent C. Gray is taking credit for the Skyland project. *See* Mike DeBonis, *Vincent Gray discusses his mayoral run*, The Washington Post, January 23, 2014 (http://www.washingtonpost.com/blogs/mike-debonis/wp/2014/01/23/vincent-gray-discusses-his-mayoral-run/). In discussing his economic development accomplishments, Mayor Gray mentioned Skyland. He stated, "The Skyland project? How do you account for that? Nobody did anything. I was the one who got that on track. We're just about ready to start construction at

Skyland.  That happened on our watch."

232.     Upon information and belief, HUD has failed to monitor the plan for Wal-Mart to be the anchor tenant at Skyland.

233.     Upon information and belief, HUD has failed to monitor or review whether the plan to have Wal-Mart as an anchor tenant is in compliance with CDBG regulations, including the national objective to benefit low- and moderate-income persons.

## Causes of action

## Count One

234.     The allegations in the preceding paragraphs are reasserted as if fully stated herein.

235.     HUD's actions have included providing and permitting the funding of the Skyland project and inadequate and untimely monitoring of the Skyland project.  Upon information and belief, at least $32,432,598.52 in funds have been disbursed for the Skyland project.

236.     HUD's actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## Count Two

237.     The allegations in the preceding paragraphs are reasserted as if fully stated herein.

238.     HUD has provided CDBG funds and permitted the use of CDBG funds, including program income, for the Skyland project, which has not met a national objective, as required by 24 C.F.R. § 570.208.

239.     HUD has violated its duty to ensure that the District and subrecipients complied with applicable CDBG and federal requirements in the Skyland project.  HUD has failed to

monitor the Skyland project and to ensure that a national objective was met, as required by 24 C.F.R. § 570.208.

240.     HUD's actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

### Count Three

241.     The allegations in the preceding paragraphs are reasserted as if fully stated herein.

242.     HUD's actions and monitoring of the Skyland project described herein have been unlawfully withheld and unreasonably delayed, in violation of the APA, 5 U.S.C. § 706(1).

### Count Four

243.     he allegations in the preceding paragraphs are reasserted as if fully stated herein.

244.     HUD has permitted the use of CDBG funds for the Skyland project in violation of Public Law 109-115, appropriating HUD funds in 2006, and Fiscal Years 2007-2010 Appropriations Acts, which prohibit the use of CDBG funds to support any Federal, state or local project that seeks to use the power of eminent domain, unless that power is sought for certain public purposes.

245.     HUD's actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

### Count Five

246.     The allegations in the preceding paragraphs are reasserted as if fully stated herein.

247.   HUD has failed to establish procedures to ensure that appraisal guidelines are followed.  HUD has failed to monitor whether appraisal guidelines are followed and has failed to establish a mechanism or remedy for property owners when appraisal guidelines and requirements are not met.

248.   Property owners, including Mr. DeSilva, had their property taken in spite of the failure of the District and NCRC to comply with appraisal guidelines, including the requirement of an appraisal review.  HUD has failed to require compliance with appraisal guidelines and requirements, including 49 C.F.R. § 24.102, 49 C.F.R. § 24.103 and 49 C.F.R. § 24.5 and § 24.9, and preparation of an appraisal review, as required by 49 C.F.R. § 24.104, for the Skyland properties, including that of Mr. DeSilva.

249.   HUD's actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

### Count Six

250.   The allegations in the preceding paragraphs are reasserted as if fully stated herein.

251.   HUD has failed to require compliance with URA regulations and requirements, including 49 C.F.R. § 24.5 and § 24.9, for property acquisitions and for relocations.

252.   HUD's actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## Count Seven

253.    The allegations in the preceding paragraphs are reasserted as if fully stated herein.

254.    HUD uses risk-based monitoring.   Monitoring may occur too late or too infrequently to prevent or correct problems or lack of compliance with applicable laws and regulations.   In the Skyland case, there have been numerous findings of noncompliance.   The Skyland property owners and tenants, including plaintiffs, were harmed by the failures to comply with pertinent HUD laws, regulations and guidelines.   The risk-based monitoring used by HUD has not occurred in a timely fashion to prevent or correct the noncompliance and to mitigate the harm and injuries suffered by plaintiffs.

255.    HUD's actions and monitoring of the Skyland project described herein have been unlawfully withheld and unreasonably delayed, in violation of the APA, 5 U.S.C. § 706(1).

256.    HUD's actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## Prayer for Relief

Wherefore, plaintiffs pray that this Court:

A.    order defendants to comply with the pertinent statutes, requirements and regulations concerning the Skyland project;

B.    order defendants to ensure that grantees adhere to applicable CDBG and federal statutes, requirements and regulations in the Skyland project;

C.    order defendants to provide mitigation and other relief to plaintiffs;

D.      issue a declaration that HUD must ensure that the District complies with pertinent statutes, requirements and regulations before the District transfers the Skyland properties to private developers;

E.      issue a declaration that HUD must advise the District to reimburse its CDBG program account in the amount used on the Skyland project with funds from a non-Federal source;

F.      award plaintiffs costs and reasonable attorney's fees incurred in this action; and

G.      grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/  Elaine J. Mittleman
Elaine J. Mittleman, Esq.
elainemittleman@msn.com
D.C. Bar # 317172
Counsel for Plaintiffs
2040 Arch Drive
Falls Church, VA  22043
(703) 734-0482